STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. FRANK MARTIN, PLAINTIFF IN ERROR.

Argued November 5, 1925—Decided February 1, 1926.

1. It is not error for a trial court to discharge from service for reasonable cause before the time fixed for the trial of a defendant, jurors drawn on a special panel from a general panel pursuant to section 82 of the Criminal Procedure act.

2. Assuming challenges to the polls for cause are improperly overruled and the jurors are then peremptorily challenged, no harm has been done the defendant, if after the jury is selected the defendant's peremptory challenges have not been exhausted.

3. If no challenge to a juror has been interposed it is proper for a trial judge to refuse to permit the defendant's counsel to interrogate the juror.

4. Assuming it to be error for a trial judge to permit a witness to refresh his recollection by reading a statement made by a defendant, such ruling is unavailing as a ground for reversal, if it does not appear in the record that the witness did use the statement, as the defendant has suffered no harm by reason of the ruling.

5. Questions asked upon cross-examination tending to test the accuracy of statements made on direct examination are proper.

6. The question as to the incompetency of a witness by reason of insanity is a question to be determined by the court and by inspection only.

7. Whether or not a mistrial shall be declared or a new trial granted is a matter within the discretion of the court. The court's decision is not reviewable on error or under section 136 of the Criminal Procedure act.

8. The charge of a court must be considered as a whole.

9. When a defendant is found guilty of murder in the first degree, the verdict being supported by the evidence and the weight thereof, he is not harmed by an erroneous definition of murder in the second degree, assuming that such definition of murder in the second degree is erroneous.

10. It is not error for the trial judge to say in his charge, "I might say this, that under the law we have a court known as the court of pardons, which, if it see fit, can set aside that sentence."

On writ of error to the Essex County Court of Oyer and Terminer.

For the plaintiff in error, *Carl Abruzzese.*

For the defendant in error, *John O. Bigelow* and *J. Victor D'Aloia.*

The opinion of the court was delivered by

KATZENBACH, J. This case is before us upon a writ of error directed to the Essex County Court of Oyer and Terminer. The writ has brought to this court for review the conviction of Frank Martin of murder in the first degree. The case is before us on strict writ of error as well as under the one hundred and thirty-sixth section of the Criminal Procedure act. On May 23d, 1925, at about three-thirty P. M., Frank Martin came to his home in Bloomfield, New Jersey. He lived with his wife, his daughter Violet Smith, wife of A. G. Smith; a daughter Helen and a son, Frank, Jr. His son-in-law was also a member of the family. Upon arriving at his home there he had a dispute with his wife and daughter, Mrs. Smith. Two police officers were summoned. Mrs. Smith, whose collie dog was said to have been the cause of the argument, refused to make a complaint against her father. The officers left. About fifteen minutes after they left they were again called to the house by Mrs. Martin. On the floor of the living room the officers found the body of Mrs. Smith. She was dead. There were a number of cuts on the body, apparently made by a hatchet. A hatchet was found on the premises. Martin was found slipping on a shirt. He was taken into custody. Later in the day Martin made a statement to the effect that his daughter Mrs. Smith brought the collie dog into the room. The dog made a rush for him. He grabbed a chair and made a rush at the dog. Mrs. Smith called to the dog and the dog came to her. The dog then came at him again. He then went into a pantry, got a hatchet, and threw the hatchet at the dog. It missed the dog but hit Mrs. Smith on the head. She fell to the floor. He spoke to her but she did not answer him. He then waited for his wife to come in. She did not come, so he finished the job by hitting Mrs. Smith on each leg with the

hatchet. He gave as the reason for finishing the job that his daughter and son-in-law had given him a rotten deal when he was sentenced to a term in the New Jersey State Prison at Trenton, some two years before the death of Mrs. Smith.

The assignments of error are forty-four in number. The specifications of causes for reversal number thirty-three. The brief submitted for the plaintiff in error argues such of these which are not abandoned under sixteen points. The points argued fall into four groups, namely, the questions which arose (a) in selecting the jury, (b) in the admission and rejection of testimony, (c) in the ruling of the trial court refusing to direct a mistrial, and (d) in the charge of the trial judge.

Pursuant to section 82 of the Criminal Procedure act a special panel of forty-eight jurors were drawn from the general panel and summoned. The defendant at the trial challenged the array. The first ground for this challenge was that one, Edgar Blackledge, named on the list had not been summoned. To prove that Blackledge had not been summoned the under-sheriff of Essex county was sworn as a witness. He had no personal knowledge of the facts but was allowed to read into the record a memorandum which had been made to the effect that the summons for Blackledge had been served on the housekeeper, June 5th; that it had been served by Peter Flanagan, June 20th, 1925. The memorandum also contained the words "In Chicago, Illinois, A. Walker." A. Walker was also a deputy sheriff. He was sworn, and testified that he had no personal knowledge of the facts but had been informed by the jury commissioner that Blackledge was in Chicago. The memorandum referred to was not a public record. It was not evidential. Assuming it to be evidential it did not prove that Blackledge had not been summoned. It, apparently, showed that the summons for Blackledge was served on his housekeeper, then served personally, and then Blackledge went to Chicago. The law is that jurors may be summoned by notice served personally or left at the juror's dwelling house. *3 Comp. Stat., p. 2966,* § 8. There was a failure of proof that Blackledge had not

been summoned. On this ground the trial judge properly overruled the challenge to the array. If Blackledge had not been summoned in accordance with the provisions of the statute, this would not have been a sufficient ground to uphold the challenge to the array. Failure to serve a member of a panel does not vitiate the entire proceeding.

The second ground advanced for a reversal of the ruling of the trial judge on the challenge to the array is that between the service of the special panel upon the defendant and the day of trial ten jurors drawn on the special panel had been excused by the court. This point has been heretofore raised, considered, and held to be without merit. *Patterson* v. *State,* 48 *N. J. L.* 381. In *Aaronson* v. *State,* 56 *Id.* 9, the precise point raised in the present case was decided in an opinion by Chief Justice Beasley. The court in that case held that for reasonable cause a juror whose name is on a list of forty-eight names served upon the prisoner may be discharged by the court. The opinion says: "If one or more of the persons on the general list can be discharged from service, why not one or more be similarly discharged from the special list?" In *State* v. *Martin,* 94 *Id.* 139, it was held that the absence of sixteen jurors of the special panel of forty-eight was not a ground for reversal. If this were not the law it would be difficult to bring a defendant to trial. While the defendant has no legal right to complain of the court's exercising its right to excuse jurors from service for reasonable cause, it is, however, a right which, in justice to the defendant, should be sparingly exercised.

The plaintiff in error next contends that the trial judge erred in disallowing challenges to the polls for cause. There were four jurors who were examined and were challenged by the defendant below. Assuming for argument that the challenges were made and wrongfully disallowed, the record discloses no harm or prejudice to the defendant by these rulings. The jurors mentioned were not members of the jury which tried the defendant. They must have been, therefore, challenged peremptorily. The defendant was allowed twenty

peremptory challenges. He challenged peremptorily sixteen jurors. His peremptory challenges were not exhausted when the drawing of the jury was completed. He was therefore not harmed by the rulings of the trial judge, of which he now complains. Such rulings constitute no ground for reversal. *Drake* v. *State,* 53 *N. J. L.* 23.

The next point argued deals with the refusal of the trial judge to permit the defendant's counsel to ask a juror what his opinion was as to the guilt or innocence of the defendant. The juror had not been challenged. There was no issue before the court. The ruling of the trial judge was correct. It is supported by the cases of *Clifford* v. *State,* 61 *N. J. L.* 217, and *State* v. *Palmieri,* 93 *Id.* 195, both cases being decisions of this court. The juror to whom the question mentioned was directed did not sit as a member of the jury which tried the defendant. The defendant was therefore not prejudiced by the ruling of the trial judge. This concludes the consideration of the group of assignments of error and specifications of causes for reversal dealing with the selection of the jury.

Counsel for the plaintiff in error next argues assignment No. 11. This deals with an exception taken to the statement of the trial judge that he would permit a witness to refresh his recollection from a statement made by the defendant. While Joseph J. Huddy, chief of police of Bloomfield, was being cross-examined he was asked a question. Before answering it the trial judge said that if counsel were referring to matters in a statement made by the defendant he would give the witness the privilege of refreshing his recollection from the statement. The defendant's counsel then stated that the witness had not yet stated he needed to refresh his recollection, to which the trial judge replied that he was merely advising the witness that he might do it. An exception was then taken to this ruling. The record fails to disclose that the witness refreshed his recollection by looking at the defendant's statement. As he did not use the statement no harm was done the defendant, assuming that the trial judge erred in his ruling.

The assignment of error next argued deals with the over-ruling of objections made to questions asked by the prosecutor upon the cross-examination of certain witnesses called by the defendant. The ground of objection was that the cross-examination was upon matters not touched upon in the direct examination. An examination, however, of the testimony satisfies us that the questions allowed upon cross-examination were proper, as they tended to test the accuracy of statements made upon direct examination by the witnesses. The defendant's counsel objected to questions asked Amelia Dillon, a sister of the defendant, as to conversations she had with her brother, the defendant. This witness was called to testify as to the nervous condition of the defendant. On direct examination she was asked this question: "What was there about him which made you come to the conclusion that he was nervous; what did he do and what did he say, if anything?" This opened the door to the questions objected to which related to conversations which she had had with the defendant. The state had the right to show by conversations of the defendant the cause of the defendant's nervousness, to which the witness had testified the defendant was subject.

There was also objection to certain questions asked on cross-examination of the witness for the defendant, John C. Devine. The overrulings of these objections by the trial court were proper rulings. The questions were of the same character as those asked the witness Amelia Dillon. They were admissible for the same reason.

The next assignments of error argued in the brief for the plaintiffs in error relate to questions asked by the state upon cross-examination of the defendant's witness Chris Murderich. This witness testified to the nervousness of the defendant. The questions asked related to whether or not the witness had not told the defendant of certain relations between members of his family and the man who later became the defendant's son-in-law. We do not consider the questions objected to improper, in view of the fact that they might have had a bearing upon or be an explanation of the

defendant's nervousness, which was the subject of the direct examination. Furthermore, the latitude of the cross-examination of a witness is a matter largely within the discretion of a trial judge. Had the questions been improper, the defendant suffered no harm by the trial judge overruling the objections made thereto, as the witness replied that he had not told the defendant the matters referred to in the questions.

The twenty-first assignment of error brings up the propriety of the court's ruling that a witness, Annie Martin, an inmate of the Hospital for the Insane at Overbrook, in Essex county, who was called by the defendant as a witness, was incompetent to testify. The trial judge held the witness incompetent. The trial of the question of the incompetency of a witness by reason of insanity must be by the court and by inspection only. *State* v. *Mohr*, 99 *N. J. L.* 124. The trial judge held that the witness was incompetent. We see no abuse of his discretion in this finding. There is, consequently, no merit in the point raised.

It is next argued that the trial judge erred in refusing to declare a mistrial or to grant a new trial, because of a remark and outburst made by the defendant's wife during the summation of the case. The court immediately, on the outburst, ordered that Mrs. Martin be removed from the court room, and admonished the jury that they must decide the case upon the evidence submitted. Whether or not a mistrial shall be declared or a new trial granted is a matter within the discretion of the trial court. It is not reviewable on error. It is not even reviewable under section 136 of the Criminal Procedure act. *State* v. *Schuck*, 96 *N. J. L.* 154.

The next assignments of error and specifications of causes for reversal deal with the charge of the trial judge. The first criticism of this charge is directed to the following portion of the charge: "The statute of this state has classified murder into two degrees, murder in the first degree and murder in the second degree, and the statute requires that, upon conviction, the jury is to designate by their verdict

whether they find the accused guilty of murder in the first degree or murder in the second degree. The distinguishing feature between the two degrees is the intent with which the homicidal act is done." It is contended that this portion of the charge impressed upon the jury that the intention to take the life of a person is the distinguishing feature between murder in the first degree and murder in the second degree, and that a layman would be led to the conclusion by the statement that if a defendant intentionally takes the life of a human being he must be guilty of murder in the first degree. It has frequently been held that a charge must be considered as a whole. *Sullivan* v. *The North Hudson County Railroad Co.,* 51 *N. J. L.* 518. The portion of the charge immediately following the part criticised reads: "If the intent was to take life, and the act was premeditated, deliberate and willful, it is murder in the first degree. And you must find, in order to convict of murder in the first degree, that the accused contemplated the act—that is to say, premeditated it; then determined upon its commission—that is to say, willfully intended it, then weighed such intent before carrying it into effect, or, in other words, deliberated." This destroys, it seems to us, the contention advanced in behalf of the defendant.

The following portion of the charge is next attacked as erroneous: "Murder in the second degree comprehends those cases of murder which are an attempt to do mere bodily harm without intent to take life, or where the act is done in the heat of passion without justification, and lacking the essential elements of the highest degree of crime—premeditation, deliberation and willfulness." This is the same language which was used by the trial court in the case of *State* v. *Mosley, ante, p.* 94, decided by this court on December 19th, 1925. In this case Chancellor Walker said: "Now, as the jury found the defendant guilty of murder in the first degree, and there was sufficient evidence to support that finding, and which was not against the weight of the evidence, the defendant is not harmed by the erroneous charge with reference to murder in second degree, assuming that there was

error in that respect." *State* v. *Mellillo,* 77 *N. J. L.* 505; *State* v. *Jayson,* 94 *Id.* 467. As, in the present case, the defendant was found guilty of murder in the first degree, as·was the defendant in the case of State *v.* Mosley, the decision of this court in the Mosley case upon this point is dispositive of this point in the present case.

The next assignment of error urged for reversal is the reference in the charge to the court of pardons made in the following language: "I might say this, that, under the law, we have a court known as the court of pardons, which, if it sees fit, can set aside that sentence." That such a statement in a charge, although deemed unfortunate, does not constitute legal error, has been repeatedly held in this court. *State* v. *Martin,* 94 *N. J. L.* 139; *State* v. *Schilling,* 95 *Id.* 145; *State Mosley, supra.*

Our examination of the evidence satisfies us that the verdict is not against the weight of the evidence. ·

This completes the consideration of all the assignments of error and specifications of causes for reversal argued in behalf of the defendant below. We find that no legal error was committed by the learned trial judge before whom the defendant was tried. The judgment of conviction is, accordingly, affirmed.

KALISCH, J. (dissenting). In order to make clear the reason of my dissent from the opinion expressed by the majority of the court, it becomes necessary for me to add to the statement of facts set forth therein these additional facts: Prior to the time of the defendant's discharge from state's prison, where he had been confined for having slashed his wife's throat with a razor, he was examined as to his mental condition, and, as I read the testimony, because of his defective mentality he was discharged by the parole board. There was testimony in the case that it was upon the request of the daughter he slew that he made his home with her. There was also testimony coming from the defendant, and it was not contradicted that he had no grudge whatever against his daughter; that he never had

any harsh words with her. The defense set up was insanity of the defendant at the time the deed was perpetrated. There was testimony to the effect that the defendant was suffering from Huntington's chorea. The physicians all agreed that this is a disease of the brain, hereditary, progressive, absolutely incurable, and, eventually, there is a complete dementia. There was also testimony that the symptoms of Huntington's chorea are wild outburst of sudden passion; that all of the brothers and sisters of the defendant, with the exception of one, were afflicted and suffering from the same disease. In fact, one of the sisters at the time was an inmate of the Overbrook Insane Asylum, suffering from the same disease. It also appears that the defendant had epileptic fits and had a convulsion while the trial was in progress, which convulsion occurred after the day's session was over. The convulsion was of such a character that he had to be carried to his cell and tied down to his cot and kept there for hours before he again became calm.

There was a challenge to the array of jurors as is set out in the majority opinion. A special panel of jurors, which the law requires to consist of forty-eight in number, drawn from the general panel, was served upon the defendant, from which he was entitled to challenge twenty without cause. It appears but ten of these jurors had been excused by the court, and with the addition of one juror, who had not been served, there were eleven absentees, and, hence, the defendant was limited to select a jury which was to pass upon his guilt or innocence from the remaining number. Exception was taken upon the ground that this was not in compliance with sections 82 and 83 of the Criminal Procedure act. I think the exception should have been sustained. The trial took place on June 30th, 1925. It appeared from the testimony of the clerk, whose duty it is to keep the record of the attendance of jurors, that all of the ten jurors had been excused from jury duty prior to the day of the trial. It is true that they had been excused from the general panel, but they were no longer jurors, and, hence, when their names were put upon the special panel of jurors, which was re-

quired to be served upon the defendant, it was a mere empty form to include the names of jurors who had ceased to be such, and as a matter of fact the defendant was served with a special panel of only thirty-eight jurors, whereas the law expressly requires that the special panel to be served shall consist of forty-eight jurors. The ten excused jurors were no longer jurors at all. Each had ceased to be such when he was excused from duty. The record further shows that they were excused by the judge before whom the case was subsequently tried. From the record there is nothing to indicate that these jurors were excused for cause.

The case of *Patterson* v. *State*, 48 *N. J. L.* 381, is therefore not in point. There can be no question that a judge has the right to excuse jurors from the general panel for cause. But it is an entirely different matter, however, in excusing jurors for a sufficient cause, and, having done so, nevertheless, to have them placed, as jurors, on the special panel after they had ceased to be jurors. Chief Justice Beasley, in *Aaronson* v. *State*, 56 *N. J. L.* 10, very wisely says this: "There seems to be no reason why the procedure touching the general list and that touching the special list would not stand on the same footing. If one or more of the persons on the general list can be discharged from service, why not one or more be similarly discharged from the special list?" This learned justice continued: "Nor do we think there is any substance in the suggestion that the power thus conceded will be liable to be abused, for it is certain that the courts cannot arbitrarily and of its own motion excuse any of these jurors from serving in the given case; for if no ground for the dispensation existed the judicial action would be erroneous, and could be reviewed by means of a writ of error."

The far-sightedness and wisdom of these remarks had in view that it would be an arbitrary act on the part of the judge to excuse jurors without cause and to decimate the number of jurors of a special panel, from which the law entitled a defendant to select a jury, and thus to practically nullify the statutory right of a special panel of forty-eight jurors. For, if ten of forty-eight jurors of the special panel

may be excused out of the general panel or special panel, then there seems to be no obstacle in the way of excusing the entire general panel. If ten may be excused why not forty-eight? And thus the defendant be compelled to select a jury from the general panel, contrary to the express mandate of the statute. Sections 82 and 83 were enacted for the purpose of guarding the rights of a defendant by acquainting him with the names of those persons who are to sit in judgment in his case and to give him an opportunity to inquire into an important feature necessary to secure to a defendant a fair and impartial trial—that is, to inquire into the jurors' competency, fairness and impartiality. I, therefore, think that the challenge should have been sustained.

I am also of the opinion that the exclusion of Minnie Martin, a sister of the defendant, who was offered as a witness on behalf of the defendant, was error. Upon an examination of this witness by the court *in camera,* in the presence of the defendant's counsel, the court said: "I am going to rule against the competency of this witness. My observation of her is that she is absolutely unable to control the movements of her body and the twitching, and, in my judgment, I do not think she is a competent witness." While it is true that the competency of the witness by reason of mental deficiency is one for the judge to determine, it cannot be done arbitrarily or capriciously, but there must be some evidence of mental incompetency, and here there was none. This brings me now to the errors assigned on the judge's charge to the jury. That the court wrongfully defined murder in the second degree is not attempted to be denied in the prevailing opinion. The answer being that the defendant was not harmed by the erroneous charge. What I have said in the dissenting opinion filed in State *v.* Mosley is applicable here, and need not be reiterated. The fact that the judges are continuing to give erroneous definition of murder in the second degree, which cannot be otherwise than prejudicial to a defendant, where the facts warrant a finding of a lesser degree, evinces a marked tendency to perpetrate error, notwithstanding the court's pronouncement in the matter, and,

unless checked, will ultimately lead to flagrant miscarriages of justice. I may stop here for a moment to point out that this very definition of murder in the second degree was expressly repudiated by statute as early as March 6th, 1839. An epitome of the law of homicide in this state will not prove uninteresting.

An act passed February 17th, 1829, section 3, reads as follows: "That every person who shall commit murder, or shall aid, abet, counsel, hire, command, cause or procure any person or persons to commit murder, shall, on being thereof convicted or attainted, suffer death."

This section is declaratory of the common law. There were no degrees of murder at common law. The homicide was either murder or manslaughter. I find nothing in our statutes which sanctions two degrees of murder until the passage of the statute of March 6th, 1839. The first section of this act reads as follows: "That all murder which shall be perpetrated by means of poison or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in perpetrating, or attempting to perpetrate, any arson, rape, sodomy, robbery or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree; and the jury, before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict whether it be murder of the first or second degree; but if such person shall be convicted on confession, in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and give sentence accordingly."

The act passed in 1839, defining murder, was incorporated in the Revision of 1847, section 4, page 258, which is as follows: "That all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premediated killing, or which shall be committed in perpetrating, or attempting to perpetrate, any arson, rape, sodomy, robbery or burglary, shall be deemed murder of the first degree; and all other kinds of murder

shall be deemed murder of the second degree; and the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate, by their verdict, whether it be murder of the first or second degree; but if such person shall be convicted on confession in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime and give sentence accordingly." This classification of murder, with its elements, remains unaltered in the later revisions.

As has been said, there were no degrees of murder at common law. Criminal homicide was either murder or manslaughter. Manslaughter is defined at common law to be homicide without malice aforethought, whereas murder is defined as unlawful homicide with malice aforethought. The distinguishing feature between the two cases of homicide was the existence or non-existence of malice aforethought. At common law, every person who kills another is presumed to have willfully murdered him unless the circumstances are such as to raise a contrary presumption. From this we derive the legal rule in this state that the unlawful killing of a human being raises no greater presumption than that of murder in the second degree, which is nothing more than murder at common law. 1 *East Cr. L.* 214; *Steph. Dig. Com. L.,* ch. 24, art. 223, p. 161; *Steph. Cr. L.* 170, says: "That unlawful killing with a deliberate intent to do slight bodily harm, which happens to cause death, is manslaughter, is a comparatively modern doctrine. By Coke's definition it would be murder." The change which was wrought by our statute in dividing murder into two degrees was a radical innovation in which constituted murder, involving capital punishment. It was a humane consideration of the subject in what class of cases the death penalty should be inflicted. And so the law-making power of this state and of every state in this union discarded the barbarous and harsh doctrine of the common law, and made it a condition precedent that before an accused could be convicted of murder in the first degree the act must be willful, must be premeditated, must be deliberate, accompanied with the specific intent to

take life.   If all these elements, namely, willfulness, pre-meditation and deliberation, with the specific intent to kill were present, they constituted murder in the first degree, but if any one of these constituents of murder in the first degree, with the exxception of *intent to kill,* was absent, and there was the intent to kill or to do grievous bodily harm, the crime is murder in the second degree.

One of the specifications for cause for reversal is that the trial court charged the jury as follows: "Under our law, if the accused at the time of committing the act was capable of distinguishing between right and wrong, and was con-scious that the act was one which he ought not to have done, he cannot be excused on the ground of insanity.   If he could distinguish between right and wrong, even if it shows that he was impelled to do what he did by an impulse which he was unable to resist, he is, nevertheless, responsible.

"Another point I might mention to you at this time, as suggested by counsel, under the law of this state, the in-sanity of a defendant cannot be used for the purpose of reducing his crime from murder in the first degree to mur-der in the second degree.   If responsible at all, he is respon-sible in the same degree as a sane man, and if he is not responsible at all, he is entitled to an acquittal."

The trial judge practically instructed the jury that, unless the insanity was to such an extent as would warrant an ac-quittal on the ground of insanity, the jury could not, even if it found that the defendant was suffering from a dis-eased mind, convict him of the lesser degree of murder. This is not only absurd, but a barbarous proposition.   This court held in *Wilson* v. *State,* 60 *N. J. L.* 171 (at *p.* 184), the following: "When the character and extent of a crime is made by law to depend upon the state and condition of the defendant's mind at the time, and with reference to the act done, intoxication, as a circumstance affecting such state and condition of the mind, is a proper subject for inquiry and consideration by the jury.   If, by law, deliberation and pre-meditation are essential elements of the crime, and, by reason of drunkenness or *any other* cause, it appears that the pris-

oner's mental state is such that he is incapable of such deliberation and premeditation, then the crime has not been committed; there is a failure on the part of the state to prove the crime into which premeditation must enter." In the same case (at *p.* 185) this court approved what was said by Judge Depue in his charge to the jury in that case, which was as follows: "If the evidence is sufficient to satisfy the jury that the intoxication of the accused, at the time of the homicide was so great as to prostrate his faculties and render him incapable of forming the specific intent to kill, which is the essential ingredient of murder of the first degree, the prisoner will not be entitled to acquittal, but his offense will be murder in the second degree. You should carefully discriminate between that excitable condition of the mind produced by drink, which is not incapable of forming an intent, but determines to act on a slight provocation, and such prostration of the faculties by intoxication as puts the accused in such a state that he is incapable of forming an intention from which he shall act." It is an abhorrent idea to contemplate that in a case of intoxication resulting, even from the voluntary act of the person, if by reason of such intoxication his mind is in such a state that he cannot form an intent to take life or to deliberate, or to premeditate, a jury should take that factor into consideration and may convict him of murder in the second degree, whilst if a person is afflicted with a mental disease, the act of God, a jury may not take that factor into consideration on the question of premeditation, deliberation, willfulness or intent, and must convict the defendant of murder in the first degree if he fails to satisfy the jury that his mental condition was such that at the time of the commission of the act he did not understand the nature of the act which he was doing, and was unable to distinguish right from wrong. State *v.* Wilson expressly says that, if by reason of drunkenness or *any other cause,* it appears that the mental state is such that he is incapable, &c., the jury may convict him of a lesser degree of homicide. To hold a person suffering from a diseased mental condition, which leaves him powerless to control his acts, accountable to

the same extent as one who lies in wait for his victim and kills him, is revolting to the conscience of the law as well as to all humane and just principles of an enlightened civilization. In another part of the charge the trial judge, in most emphatic language, instructed the jury that, unless the insanity was to such a degree as he defined it, even though the prisoner was insane at the time, it did not reduce his crime from murder in the first to murder in the second degree. For this reason alone the judgment should be reversed. In conclusion, I might say that I gather from the facts of this case, with the attendant atrocious circumstance of the hacking of the body of his daughter by her father, that the latter was the manifestation of manical frenzy of a madman. The inadequate cause for the commission of the deed, the absence of any serious quarrel between the father and daughter, the fact that she was his daughter, and that the deed was an unnatural one, the fact that he had some two or three years prior thereto attempted to take the life of his wife, indicate that he was afflicted with a homicidal mania, but not to the extent to excuse him under the law of this state from criminal responsibility, but not in the highest degree. He should have been restrained of his liberty, since he was a dangerous person to be let loose upon society, but that is no justification to deal with him in any other way than is sanctioned by the application of correct legal principles. I think, therefore, besides the grave errors committed by the trial judge, which misled the jury and call for a reversal, the facts of the case, under the legal rule applicable to them, did not warrant a verdict of a higher degree than that of second degree murder, and, therefore, the judgment should be reversed, and a new trial ordered. Justices Minturn, Campbell and Judge Kays authorize me to say that they concur in the views expressed in the dissent.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, BLACK, KATZENBACH, LLOYD, WHITE, GARDNER, VAN BUSKIRK, HETFIELD, JJ. 11.

*For reversal*—MINTURN, KALISCH, CAMPBELL, KAYS, JJ. 4.