STATE EX REL. STATE HIGHWAY COMMISSION, Relator, v. HOPKINS B. SHAIN, FRANCIS H. TRIMBLE and EWING C. BLAND, Judges of the Kansas City Court of Appeals.—62 S. W. (2d) 711.

Court en Banc, July 20, 1933.

*John W. Mather, Jean Paul Bradshaw* and *Ralph M. Eubanks* for relator.

*Ira H. Lohman* and *Irwin & Bushman* for respondents.

GANTT, C. J.—Original proceeding in mandamus. Relator seeks to compel the judges of the Kansas City Court of Appeals to set aside its order dismissing the appeal in the case of Euler v. State Highway Commission and to reinstate said case on its docket.

The case was before said court at the March Term, 1931. At that time the judgment was affirmed because of certain defects in the abstract. However, appellant under Rule 15 of said court sought to correct said defects by filing a supplemental abstract. The Court of Appeals ruled that the correction was not authorized under the rule. In an original proceeding in mandamus in this court it was ruled to the contrary, and the Court of Appeals was commanded to proceed in due course to a disposition of the case. [State ex rel. State Highway Commission v. Trimble, 329 Mo. 987, 47 S. W. (2d) 779.]

The State Highway Commission (appellant) then filed a new abstract and brief in said court. Thereupon respondent Euler filed a motion to dismiss the appeal on the ground that the abstract did not comply with Section 1028, Revised Statutes 1929, and Rule 15 of said court.

He also filed a motion to dismiss the appeal on the ground that the statement of the case made by appellant (State Highway Com-

236

mission) did not comply with Section 1060, Revised Statutes 1929, and Rule 16 of said court.

The section requires a clear and concise statement of the case. The rule also requires a clear and concise statement that the court may be informed of the material facts from the statement without being compelled to glean them from the abstract of the record.

The motions were sustained. In doing so the court said:

"We see no escape from the necessity of dismissing the appeal for either one or both of the aforesaid violations of the rules in relation to the presentation of appeals. It is not a matter within our discretion. It is our duty to enforce the rules made to further the purpose and efficient dispatch of business." [Euler v. State Highway Comm., 55 S. W. (2d) 719, 1. c. 722.]

The circumstances considered, the statement should speak for itself. It follows:

"In 1924 Ernest H. Euler, a contractor from Kansas came into Missouri. The occasion for his appearance in Missouri was the letting of two contracts for the construction of Sections 5 and 6 of Missouri State Highway No. 6 in DeKalb County, Missouri.

"In contemplation of being awarded the work, the Respondent moved a subcontractor on the ground during the latter part of August, 1924. On the 3rd day of September, 1924, the Appellant sent out to the Respondent the regular 'Notice to Proceed,' which is the contractor's authorization to begin work.

"Under the terms of these two contracts signed by Ernest H. Euler and the State Highway Commission of Missouri, no part of the work was to be *finally* approved and accepted until the whole thing covered in the contract was finished. By the terms of the contract for the construction of Section 5 and also by the terms of the other contract for the construction of Section 6, Mr. Euler had bound himself to complete the work by the 31st day of December, 1924.

"It soon became apparent that the construction of these two sections could not be finished by the Respondent by the 31st day of December, 1924, the completion date in the two contracts. Therefore, the State Highway Commission, at the request of Mr. Euler, granted an extension of time and set the completion date for the 18th day of February, 1925. In this connection, we might say that no further extension of time was ever asked by Mr. Euler or granted by the Commission.

"Section 5 was completed and accepted on the 26th day of September, 1926, exactly one year, one month and eight days after the extended completion date of the contract. And Section 6 was completed and accepted on the 9th day of August, 1926, exactly one year, five months and twenty-two days after the extended completion date of that contract.

"Under the provisions of Sections 4-37, 3-8 and 3-39 of these two contracts, the State Highway Commission was authorized to hold back ten per cent of the contract price (the rest being paid over to the contractor as parcels of a mile or so were completed and taken over for maintenance but not finally accepted); and from this retent the Commission was authorized to deduct any liquidated damages provided for in the contract and arising from a breach of the contract. It was provided in Section 4-35 of the contract that if the contractor should not complete the work by the completion date, liquidated damages upon both contracts should be assessed against him in the amount of $25 for each day's delay.

"Pursuant to this provision in the contract, the Commission assessed against the contractor and retained from his retent upon the contract for Section 5 (which he completed one year, one month and eight days late) thirty-five days' delay at $25 per day. And upon Section 6 (which the contractor completed one year, five months and twenty-two days late) the Commission assessed liquidated damages for only fifty-seven days at $25 per day.

"It should be pointed out here that this assessment of liquidated damages was exercised by the Commission only to the extent necessary to compensate it for actual loss due to the contractor's delay. In other words, although the contractor was 403 days late in completing the contract on Section 5, the Appellant assessed liquidated damages for only thirty-five days. And that although the contractor was 537 days late in the completion of the contract on Section 6, the Appellant assessed liquidated damages for only fifty-seven days.

"It should be pointed out that the two contracts signed by Mr. Euler were the regular State construction contracts which contain provisions to the effect that the Appellant's Chief Engineer shall be constituted arbiter of any dispute arising between the contractor and the State as to the interpretation of the contract, the order and manner of prosecuting the work, and the acceptability of the work when completed. These provisions are found in Section 4-29 of the contract. In fact Section 4-38 provides that payments shall only be made upon estimates prepared and approved by the Appellant's Chief Engineer as arbiter.

"Among other provisions, this contract provided that all materials encountered in the roadbed should be classified under three types: (1) 'Earth Excavation,' for which the price was 33 cents per cubic yard; (2) 'Loose Rock Excavation,' for which the price was 85 cents per cubic yard; and (3) 'Solid Rock Excavation,' for which the price was $1.75 per cubic yard.

"Section 77 of the contract provided for the application of the 'plow test' for the purpose of determining into which of the three classifications any material encountered should be put. That is to say, all material which could be 'satisfactorily loosened with a road

plow and four powerful horses' should be classified as earth excavation. The contract then provided that if material were encountered which could not be 'loosened satisfactorily with a road plow and four powerful horses but can be loosened with a rooter plow and four powerful horses' should be classified as loose rock excavation. Finally, the contract specified that 'rock boulders of more than 13 cubic foot volume and all solid or ledge rock which it is impractical to loosen and handle with a pick and shovel' should be classified as solid rock excavation.

"These two contracts for the construction of Sections 5 and 6 of this highway in Dekalb County had been let on the basis of earth excavation at rate of 33 cents per cubic yard.

"Among other provisions, the contract, in Section 59-13, provided with considerable detail, the manner in which all 'mixing and placing' of 'concrete masonry' was to be done. In this section of the two contracts it was specifically provided that 'concrete shall be placed in freezing weather only with the approval of the engineer and . . . concrete shall not be placed against steel forms when the temperature is below 32 degree Fahrenheit.' The 'engineer' here referred to, the contract defined as the 'chief engineer of the State Highway Commission or his representative.'

"Specification XXIII provided for the placing of guard rails along the side of the road. These guard rails were to be furnished by the State but the work of installing them was a part of the two contracts.

"Mr. Euler being from Kansas and never before having had a contract with the State of Missouri for the construction of highways, executed a 'Special Provision' which was attached to and made a part of the regular contracts. Paragraph 14 of this Special Provision provided that the work on these two contracts 'shall be diligently prosecuted at such a rate and in such a manner as in the opinion of the engineer (Chief Engineer of the State Highway Department) is necessary for the completion within the time herein specified, it being understood that time is of the essence of this contract.'

"The evidence indicates that soon after Mr. Euler came into Missouri and undertook this work, he began to experience financial difficulties. He sought to have the State accept this work in parcels of a mile or less and to advance him money on such portions so that he might hire 'more and better teams.'

"Also it appears that although Mr. Euler had gone over the work before he bid on the undertaking, and although he had had an opportunity to examine the nature of the material to be excavated for the roadbed, yet he encountered a type of material which he had not expected. He described it as an 'impervious blue clay' substance. He testified that four powerful horses could not drag a rooter plow through this clay and that it cost him a great deal more to remove it than he had expected. He had the State's engineer to

examine the material. The latter maintained that this 'blue clay' which the contractor described as 'impervious' was not even of the type of material entitled to be classified as 'Loose Rock Excavation;' and it was his opinion that this material could be classified as 'Earth Excavation' at the regular price of 35 cents per cubic yard.

"Upon this matter there was quite a difference of opinion. The contractor contending that it should be classified as 'Solid Rock Excavation.' at a price of $1.75 per cubic yard, while the Chief Engineer of the State Highway Department contended that it should be classified as 'Earth Excavation' at a price of 33 cents per cubic yard. The 'plow test' provided for in the contract was never applied. The evidence indicates that the Commission sought on one occasion to have the contractor make this test; but the contractor declined to make the test in the presence of the State' representative, informing the Commission's representative that he had no 'powerful horses' available at that time.

"At any rate the Commission proposed that upon this controverted question the parties should agree upon payment at the rate of 66 cents per cubic yard. In this connection it should be borne in mind that no one of the three classifications in the contract provided for a 66 cents price. In other words, the parties compromised upon 66 cents a cubic yard.

"After this agreement had been reached, the State Highway Commission issued to the contractor three 'Change Orders' directing the doing of this work and stating that the price would be '66 cents per cubic yard.' At the bottom of each Change Order there was a form of receipt where the contractor might sign that the 'terms of settlement are hereby agreed to.' Two of these Change Orders referring to the contract on Section 5 were signed by Mr. Euler and returned to the State Highway Commission. The third one he did not sign but he did accept the money provided for in such Change Order. In this same connection it might be said that at the time of the trial Mr. Euler did not remember whether he signed Defendant's Exhibit B written on June 15, 1925, to the Commission's engineer, Mr. Sack, and reading:

"'Dear Sir: For classified material as shown on the plans, I agree to move and place in embankment as shown on the plans for 0.66 cents per cubic yard.

"'Very truly yours,
"'(Signed) ERNEST EULER,
"'E. H. EULER, Contractor.'

"After the work was completed, and after he had accepted and gotten the 66-cent compromise figure provided in the Change Orders, Mr. Euler filed this suit in which he claimed in Counts Nos. 2 and 10 that he had been coerced into the agreement of 66 cents as a compromise figure under the threat that if he did not accept the

66-cent compromise figure the State Highway Commission of Missouri would follow the conviction of its engineers who contended that this controverted material properly fell within 'Earth Excavation' class and would pay him at the rate of only 33 cents per cubic yard.

"When it became apparent that this work could not be finished in December of 1924, the completion date was extended to February, 1925. However, in July, 1925, five months after the extended completion date, the contractor was still working on the roadbed trying to get it finished. About this time he applied to the State Highway Commission for the guard rails, informing the Commission that he expected to take part of the men off of the work on the roadbed and put them to work on the guard rail. Because the contractor was already behind in his work, and because winter weather was coming on with the roadbed in an incompleted state for winter traffic, the Appellant's Chief Engineer, under sections of the contract authorizing him to direct the order and manner of progressing with the work, refused to supply the guard rail until the contractor had finished the roadbed. With all of his men working on the roadbed, the contractor finally succeeded in completing this part of the work on Section 5 by December, 1925. The next day the Appellant's Chief Engineer issued the guard rails to the contractor; but they were not installed until the following April, the Respondent at the trial explaining that he concluded the ground was too hard.

"Section 4-38 having authorized the Commission to withhold payment of the above mentioned retent until after the work was completed, the Commission withheld from the contractor a $4,000 retent until the guard rails were finally installed in April, 1926.

"Count 4 of Plaintiff's petition asked that he be allowed interest on this $4,000 retent from December, 1925 to April, 1926.

"Now, in the petition which the contractor filed after the work was completed and he had been paid, he devoted Count 8 to the recovery of damages arising from the State's refusal to accept a frozen bridge pier. It appears that the Respondent employed a subcontractor to build a concrete bridge pier included in one of his contracts. Although the contracts entered into by Appellant and Respondent provided that concrete should not be poured when the temperature was below 32 degrees Fahrenheit, and although those same contracts carefully specified that under no circumstances should concrete be poured in freezing weather without the Appellant's engineer being there to supervise the work, the Respondent's subcontractor refused to follow these provisions of the contract. He poured the concrete pier when the temperature was between 12 and 13 degrees Fahrenheit and without even having notified the Appellant's engineer of his intention to do this concrete work in freezing weather.

The Respondent admitted that while this was going on he was at home by the fire, and he further admitted in a letter to the State Highway Department that this bridge pier, poured contrary to the contract in freezing weather and without notice having been given to the Appellant's engineer, 'ought to have came out.'

"The result of this unsupervised concrete masonry in freezing weather contrary to the provisions of the contract, was that the concrete froze and the State Highway Commission refused to accept it until it was replaced. Whereupon the Respondent removed the frozen bridge pier and replaced it with another pier constructed under the supervision of the Appellant's engineer as the contract provided. Then when the Respondent filed this suit, he set up a claim for damages and was by the trial court permitted to recover because the Appellant had refused to accept the frozen bridge pier. Although Section 4-29 of the contract provided that the Appellant's Chief Engineer should be the final arbiter as to the acceptability of the Respondent's performance of the work, the trial court permitted the Respondent to recover upon this count upon the theory that the Appellant's engineer did not decide wisely in requiring all of the bridge pier to be taken out whereas the trial judge's opinion was that it might have been satisfactory had only a part of the frozen bridge pier been removed.

"Finally, in this petition filed by the Respondent, he undertook to recover back the retent retained by the Appellant in settlement of liquidated damages. It was the contention of the Respondent that the delay for which liquidated damages were assessed was an 'unavoidable delay' excusing him from liability for non-performance. He said that such 'unavoidable delay' was occasioned by three circumstances: (1) unforeseen clay deposits; (2) unfortunate weather conditions; and (3) the changes made by the Appellant's engineer.

"Over the objection of the Appellant, who maintained that unforeseen clay deposits and unfortunate weather conditions were no excuses for failure to complete the contract on time, the Respondent was permitted to introduce evidence showing the condition of the weather and the nature of the clay deposits. But in introducing his evidence on this count, no effort was made to distinguish these three circumstances and to show how much of the so-called 'unavoidable delay' was occasioned by each of the three.

"In the summary then, the Respondent sought in Counts 1 and 9 to recover back the liquidated damages assessed against him for his completion of these contracts two and one-half years late, contending that his tardiness ought to be excused because he encountered a different sort of material than he expected, and because it had rained more than he had hoped, and because the Appellant's engineer demanded more changes than he had foreseen. Also, in Count 9 he maintained that the delay in completing Section 6 ought

to be excused because, contrary to the terms of the written contract signed by the Appellant and Respondent, the Respondent had relied upon the oral information of some one of the Appellant's local employees that he (the Respondent) need not be governed by the commencement and completion dates stipulated in the written contract. Upon these counts the question before the Court is whether such 'circumstances' constitute justifiable grounds for delaying the completion date of the work; and if any one of them does, whether there is evidence showing the amount of delay caused by that particular circumstance.

"In Counts 2 and 10 the Respondent sought to recover compensation for excavating certain material. In both of these counts the question now before this Court is the effect to be given Section 4-29 of the contract, authorizing the Appellant's Chief Engineer to act as arbiter in construing the provisions of the contract, and the effect to be attached to what the Appellant maintains was a voluntary compromise agreement for the classification of material at a compromise figure of 66 cents per cubic yard.

"In Count 4 the Respondent sought damages in the form of interest on the $4,000 retent withheld until April, 1926, when the work was completed, it being his argument here that the Appellant's Engineer, authorized in Section 4-9 of the contract to direct the order and manner of proceeding with the work, had erroneously decided in July, 1925 (when the contractor was already five months late in the completion of his work), that it would be better to finish the roadbed before beginning on the guard rails.

"And finally, Count 8 concerns itself with recovering damages arising from the removal of a frozen bridge pier on Section 5. It appears from the evidence that there is no conflict in the testimony concerning the fact that the concrete was frozen. The contention of the Respondent is that the Appellant should have accepted a part of the pier and that again the Appellant's Engineer, authorized in Section 4-29 of the contract to pass upon the acceptability of the work, had erred in his decision.

"Of the fifteen counts in the Respondent's Petition, the court allowed recovery, or partial recovery, on Counts 1, 2, 4, 8, 9 and 10, entering judgment against the Appellant in the sum of $7,527.06 (reduced in the trial court to less than $7500).

"The principal objection to the trial court's action in entering judgment upon these six counts for the Respondent, is that in so doing the trial court failed to give effect to the provisions of the two contracts entered into by the Appellant and Respondent. Consequently, the case is before this Court on appeal from the judgment so entered by the trial court for the Respondent."

It is clear that the statement is not a compliance with the statute and rule of said court. The motion to dismiss the appeal for failure of

appellant to comply with said rule and section was well ruled by the Court of Appeals. It will not be necessary to consider the ruling on the motion to dismiss on account of defects in the abstract.

The peremptory writ should be denied. It is so ordered. All concur.