STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
JOHN JOSEPH KOCIOLEK, DEFENDANT-APPELLANT.

Argued November 26, 1956—Decided February 11, 1957.

402

Mr. *Isaac C. Ginsburg* argued the cause for appellant.

Mr. *David R. Brone,* First Assistant Prosecutor, argued the cause for the State (*Mr. Lewis P. Scott,* County Prosecutor, on the brief).

The opinion of the court was delivered by

HEHER, J. In the Atlantic County Court the defendant Kociolek was convicted by a jury of murder in the first degree without recommendation of life imprisonment, and accordingly was sentenced to death; and the judgment is here for review by direct appeal of right under *Article* VI, *Section* V, *paragraph* 1(*c*) of the 1947 *Constitution.*

A prior judgment imposing the death sentence on a conviction of first-degree murder was reversed, 20 *N. J.* 92 (1955), and the retrial resulted in the judgment presently before us.

### I.

The overruling of the accused's challenge to the array, or to the panel from which the trial jury was drawn, is now assigned for error.

The basic ground of challenge is that the trial jury was not impanelled as directed in *N. J. S.* 2A:74–9, providing that in all cases where the person indicted for crime is entitled to 20 peremptory challenges and to have a "list of the jury" delivered to him previous to his trial, the sheriff or other proper officer shall draw a list of 48 jurors "or such larger number as is directed by special order of the court"; also, that "Such drawing shall be from the general panel of jurors drawn and summoned to attend during the stated session at which such defendant is to be tried and shall be made from the box in the presence of the judge of the county court, or in the presence of the clerk of such court"; and "If 48 jurors, or such larger number as may be specified by the special order aforementioned shall not have been so drawn and summoned, or if, for any reason, the number of jurors drawn and summoned shall be reduced below 48, or such larger number as aforesaid," the sheriff or other officer is directed to "add to the number so drawn and summoned as many more persons of the body of his county, qualified to serve as jurors, as shall make up the number of 48, or such larger number as aforesaid"; and, in its final clause, that "Defendant or his counsel may, at any time, in open court, except where the indictment is for treason or murder, waive the drawing or service, or both, of the list of jurors, and consent to be tried by a jury drawn in the ordinary way from the general panel."

And reliance is also placed on *R. R.* 3:7–2, providing that any person indicted for treason, murder or kidnapping "shall have a list of the jury delivered to him at least 3 days before the trial," and the prosecutor or the defendant or his attorney "may challenge the array on the ground that the jurors were not selected, drawn or summoned according to law, * * *." It is there directed that a challenge to the array be in writing, which was so here, "and decided before any individual juror is examined."

The general panel of jurors for the "Stated Session commencing" May 1, 1956 consisted of 390 persons. By order made February 20, 1956 the assignment judge directed that

the "Grand Jury List" comprise 125 persons, and the "Petit Jury List" 400 persons, and that the county clerk or his deputy "present in open court" on April 20 ensuing the "Jury Lists for the Stated Session filed with him, pursuant to *R. S.* 2A:71–1, and at the same time and place, pursuant to *R. S.* 2A:71–2, the Jury Commissioners shall draw 35 Grand Jurors and four separate Petit Jury Panels: Two panels to consist of 75 Petit Jurors each to serve for the trial of criminal causes in the Superior Court and County Court at Mays Landing, and two panels to consist of 75 Petit jurors each to serve for the trial of civil causes in the Superior Court and County Court at Atlantic City, and the remainder of the general panel consisting of 100 Jurors shall constitute a reserve list of jurors from which each of the foregoing panels may be supplemented if necessary."

This "written directive," the State maintains, "is implicit in the meaning of *R. R.* 1:29–1, and in the proper construction to be given to *N. J. S.* 2A:74–8," providing that "The judges of the county court sitting for the trial of issues or causes in a county in which the general panel of petit jurors has been divided into separate panels may direct the drawing of juries from 1 or more of the separate panels," and "In the drawing of trial juries in such cases there shall be put into the box the names of the jurors constituting 1 of the separate panels designated by the trial judge"; and "If because of challenges, the default of jurors or otherwise, a sufficient number of jurors cannot be had from the jurors composing any separate designated panel," the court shall direct the sheriff "to order the jurors composing another of the separate panels into which the general panel has been divided to attend the court," and the names of the jurors composing such other separate panel "shall be put into the box."

And the State suggests that the assignment judge is authorized "to set up separate panels" by the last sentence of *N. J. S.* 2A:71–2: "The persons whose names are announced shall constitute the panel of petit jurors for

service in the county for the next ensuing stated session of the courts therein, *or for such part thereof as the assignment judge may direct.*" The italics indicate the phrase deemed of determining significance in this regard.

The general panel was accordingly divided into four separate panels, each comprising 75 jurors, designated Criminal No. 1, Criminal No. 2, Civil No. 1 and Civil No. 2, and a fifth called the "Reserve Panel," consisting of 90 jurors.

The county judge orally directed the sheriff "to cause" the 75 jurors composing Criminal No. 1 panel "to be brought in" for the trial of the indictment returned against the defendant; and this was done. There was no written order to that end. It was stipulated on the hearing of the challenge that there "was no redrawing out of all of the jurors returned for the May term of a panel of 48 jurors, or of any other number, to try this indictment." The challenge to the array was interposed at the outset; and it was disallowed for want of a showing of "prejudice," since the accused "in fact was given a larger list than 48," and there was no merit in the point that recourse should have been had to the "higher panel, including the civil," inasmuch as the order of the assignment judge directed the selection of "two panels of 75 petit jurors each, to serve for the trial of criminal cases in the County Court at Mays Landing," and two panels of 75 jurors each to serve in the trial of "civil cases in the Superior Court."

But the course thus taken was in utter disregard of the requirement of *N. J. S.* 2*A* :74–9 that "in all cases where" the indicted defendant "is entitled to 20 peremptory challenges and to have a list of the jury delivered to him previous to his trial," the sheriff shall draw a special panel of 48 jurors, or such larger number as may be directed by special order of the court, from the "general panel of jurors drawn and summoned to attend during the stated session at which such defendant is to be tried," the drawing to be made from the box in the presence of the judge of the County Court or the clerk of the court, a course of procedure so imperative in expression as to bar waiver by the defendant or his counsel

where the indictment is for treason or murder, although in all other cases there may be a waiver, "in open court," by the defendant or his counsel, of "the drawing or service, or both, of the list of jurors, and consent to be tried by a jury drawn in the ordinary way from the general panel."

The statute in peremptory terms directs the drawing of a special panel from the general panel for the particular case; and the basic policy concept would seem to be the timely selection of the special panel to afford the accused, and the State as well, an opportunity for inquiry and due consideration of the qualifications of the jurors, an informed exercise of the essential right of challenge and thus to insure a fair and impartial trial, all this not alone as a concession to the accused's personal interest in a just trial, but also in fulfillment of society's concern in a rational course of justice precluding arbitrary action and deprivation of life or liberty save by due process of law, a responsibility of deeper gravity in capital cases, indeed a duty embedded in the natural law. The natural life, says Blackstone, "cannot legally be disposed of or destroyed by any individual, neither by the person himself, nor by any other of his fellow creatures, merely upon their own authority." 1 *Blk. Com.* 133. See *Hopt v. People of Utah,* 110 *U. S.* 574, 4 *S. Ct.* 202, 28 *L. Ed.* 262 (1884), Harlan, J.; *State v. O'Leary,* 110 *N. J. L.* 36 (*E. & A.* 1933).

The State insists that *N. J. S.* 2*A* :74–8; 2*A* :71–8 and 2*A* :74–9 are *in pari materia* and "should be so read," citing *R. S.* 1 :1–1, and the "mandatory presumption to be given to the word 'shall' as employed in 2*A* :71–9 is overcome by the character of the whole legislation—2*A* :74–8, 2*A* :71–8 and 2*A* :74–9"; the "context of these statutes," it is said, "justifies the conclusion that the word 'shall' as appears in 2*A* :74–9 was intended to be considered directory and not mandatory." *N. J. S.* 2*A* :71–8 provides for the division of the general panel of petit jurors summoned for the "trial of causes" into two or more separate panels, in the discretion of the assignment judge, in a county in which there are two or more courts sitting simultaneously or where cases are

tried in different parts of the county, for service in a court or place and for a period designated in the order to that end.

And we are asked to take judicial notice of the fact that "there are but six Counties" of the State "having but one trial judge," and the remaining 15 "are serviced with from two to four County Courts"; that "In counties having two or more trial judges the court rooms are located, more often than not, on different floors of the building, or in separate buildings, and in the case of Atlantic County they are separated by many miles"—the criminal trials are conducted at Mays Landing, the county seat, and the civil trials at Atlantic City, a distance of 19 miles, and the Atlantic County District Court "is two blocks removed from the Atlantic County Court, and the Superior Court is located three blocks from the County Court"; that in the six counties having but one judge, "there can be no division into separate panels, since *N. J. S.* 2*A* :74–8 and 2*A* :71–8 [are] limited to counties having more than one judge"; hence, *N. J. S.* 2*A* :74–9 "remains effective in those counties, requiring a drawing of 48 or more jurors to be taken from the *general panel*," and thus "there is no inconsistency in the statutory scheme for the selection of trial juries."

But *N. J. S.* 2*A* :74–9 is not so circumscribed; a holding that it is of such limited application would do violence to the spirit and indubitable reason of the legislative expression. The act is not only cast in imperative terms; its essential nature excludes the hypothesis of a purely directory declaration, of no avail if, after the challenge to the array is overruled, the subsequent adverse verdict cannot be overturned unless there be a showing of prejudice in the organization of the jury. If that were so, then the legislative directions for the establishment of juries, the heart of the system, could be disregarded with impunity.

This provision is designed to secure a fair and impartial jury; and such regulations in their essentials are ordinarily deemed mandatory, and there can be no doubt of the legislative intent to that end here, for the defendant's waiver of the "drawing or service, or both, of the list of·jurors" is

expressly forbidden where the indictment is for treason or murder; and in all other cases of the enumerated class, the waiver and consent are to be given in "open court." It is not necessary to show actual prejudice; it is enough that the Legislature has so commanded; all that need be shown is that the jury was not constituted in accordance with the statute. Compare *State v. Rombolo,* 89 *N. J. L.* 565 (*E. & A.* 1916); *State v. Lapp,* 84 *N. J. L.* 19 (*Sup. Ct.* 1913). And see *Walter v. State,* 208 *Ind.* 231, 195 *N. E.* 268, 98 *A. L. R.* 607 (*Sup. Ct.* 1935). "The question is whether a proper tribunal was established, and not whether an improperly established tribunal acted fairly." *Shulinsky v. Boston & Maine R. R. Co.,* 83 *N. H.* 86, 139 *A.* 189 (*Sup. Ct.* 1927); *State v. Kelly,* 100 *Conn.* 727, 125 *A.* 95 (*Sup. Ct. Err.* 1924). Compare *State v. McGee,* 80 *Conn.* 614, 69 *A.* 1059 (*Sup. Ct. Err.* 1908); *Healey v. People,* 177 *Ill.* 306, 52 *N. E.* 426 (*Sup. Ct.* 1898); *State of Missouri v. Rouner,* 333 *Mo.* 236, 64 *S. W. 2d* 916, 92 *A. L. R.* 1099 (*Sup. Ct.* 1933). See also 50 *C. J. S., Juries,* § 164, *p.* 891; 31 *Am. Jur.* 611.

And a companion provision of the statute, *N. J. S.* 2A:74–10, makes clear the legislative intent and purpose. Recourse to the general panel can be had only "(w)hen the special panel or list of jurors served on a defendant in any criminal case in which he shall be entitled to 20 peremptory challenges shall, from any cause, be exhausted before a jury for the trial of the indictment shall be obtained"; in that event, "talesmen shall be taken from the general panel of jurors returned during the stated session at which the defendant is to be tried, if any remain"; and if "more talesmen are required than the number of jurors remaining on the general panel," the sheriff or other proper officer is directed to summon forthwith, "from among the bystanders or others," such "additional number of persons qualified to serve as jurors" as the court may order, and place the names of the persons so returned in the box "and draw therefrom until the jury is completed," and to repeat the process if need be "until the necessary number of jurors shall be

obtained." But the defendant shall not be entitled "to a service of the list of talesmen taken from the general panel after the special panel is exhausted, nor of the talesmen summoned by order of the court," unless the court "shall specially so direct," in which case the court "shall fix the length of time the list of talesmen shall be so served, before the drawing of the jurors shall proceed."

The provisions of *N. J. S.* 2*A* :74–9 and 2*A* :74–10 are of long standing, *R. S.* 1937, 2 :91–2; 2 :91–3, *L.* 1898, *c.* 237, *sections* 82, 83; and we know of no case in which the failure to comply with the provision for a special panel in a case such as we have here was deemed a purely formal lapse in the absence of a showing of actual prejudice. Indeed, such a holding would nullify a statutory direction so vital in legislative intendment as to be expressly secured against the voluntary waiver of the defendant himself and his counsel. The cases deal in the main with the proceedings subsequent to the drawing of the special panel. See *State v. Rombolo, supra; State v. Tomassi,* 75 *N. J. L.* 739 (*E. & A.* 1908); *State v. Martin,* 94 *N. J. L.* 139 (*E. & A.* 1920); *State v. Rosenberg,* 97 *N. J. L.* 430 (*Sup. Ct.* 1922); *State v. Mohr,* 99 *N. J. L.* 124 (*E. & A.* 1923); *State v. Turco,* 99 *N. J. L.* 96 (*E. & A.* 1923); *State v. Martin,* 102 *N. J. L.* 388 (*E. & A.* 1926); *State v. Doro,* 103 *N. J. L.* 88 (*E. & A.* 1926); *State v. Juliano,* 103 *N. J. L.* 663 (*E. & A.* 1927); *State v. Cioffe,* 128 *N. J. L.* 342 (*Sup. Ct.* 1942), affirmed 130 *N. J. L.* 160 (*E. & A.* 1943).

In *State v. Rombolo, supra,* the judgment of conviction was reversed since only 31 of the 48 jurors constituting a special panel, duly drawn from the general panel under the particular section, were placed in the box, the others being then in service on other juries; and the holding was, Gummere, C. J., that resort to the general panel for the completion of the jury constituted a violation of *R. S.* 2 :91–2 and so ground for reversal of the judgment of conviction.

And in *State v. Tomassi, supra,* Pitney, J. affirmed that the drawing of a special panel of 48 to be served upon the defendant was "required only when the general panel consists

of more than that number, the drawing being intended for the purpose of selecting 48 jurors out of a greater number," and "Where the general panel consists of more than 48 the drawing is essential." The third sentence of *N. J. S. 2A* :74–9 is no doubt a survival of the early days when the general panel was usually 48 in number. At all events, such has been the unvarying interpretation of these interrelated statutes over the years.

■ The validity of a challenge to the array of necessity depends upon the circumstances and the right when the challenge is interposed. And administrative considerations are utterly irrelevant; expediency in other directions affords no ground whatever for subverting the essential legislative policy, related as it is to the essence of criminal procedural justice.

■ And in principle it does not matter that the accused did not exhaust his allowable statutory challenges to the poll. There was here a radical procedural deficiency involving the constitution of the jury.

## II.

The defendant contended at the trial that he "suffered an amnesia for a period before the alleged commission of the crime and for a period subsequent thereto," and there was medical testimony that in such circumstances he would not have a "conscious awareness" of his actions.

In preparation for the earlier trial, the accused's then attorneys "hired" Dr. James B. Spradley, a psychiatrist, "to examine" their client "for the purpose of informing the attorneys whether or not a defense of insanity, or some other mental condition, might be utilized." The client was indigent; and the county defrayed the cost of the inquiry. In the course of the examination, the doctor interrogated the accused as to his knowledge and understanding of the circumstances attending the commission of the offense thus laid to him; and the result was "unfavorable conclusions" which disposed of him as a witness for the defense at either trial.

Learning of Dr. Spradley's examination and the "unfavorable report," the prosecutor asked for a copy of the findings. When the doctor demurred, questioning the propriety of the disclosure, he was "reassured" by the prosecutor, and he then complied with the request.

On the second trial, the State called Dr. Spradley as a witness in rebuttal; and, while it is asserted that he "was limited to expert opinion evidence," the witness made known to the jury, over objection, the nature and details of his examination and interrogation of the defendant and the ensuing adverse conclusions. He was permitted to testify that the accused had "of his own recollection" recited to him the circumstances of the doing of the thing charged, "detailed information respecting the period right up to the time of the shooting and afterward," "details of what he did"; and this recital contradicted the accused's testimony that he had no recollection of the occurrence, given before Dr. Spradley testified. And the defense had then adduced psychiatric opinion evidence deemed favorable from another specialist, Dr. Dinenberg.

The point made is that the "findings and report" of Dr. Spradley "were privileged and protected from disclosure to the State," and the "information obtained by" him "from the defendant was likewise privileged"; and if this be so there can be no doubt of reversible error.

The contention of privilege is not based upon the relation of "doctor and patient," but rather that of attorney and client in that the "doctor was the agent of the attorney and the sub-agent of the defendant, or *vice versa*," and "in any event, he was an agent," citing *Webb v. Francis J. Lewald Coal Co.*, 214 *Cal.* 182, 4 *P. 2d* 532, 77 *A. L. R.* 675 (*Sup. Ct.* 1931); *Schmitt v. Emery*, 211 *Minn.* 547, 2 *N. W. 2d* 413, 139 *A. L. R.* 1242 (*Sup. Ct.* 1942); *City and County of San Francisco v. Superior Court*, 37 *Cal. 2d* 227, 231 *P. 2d* 26, 25 *A. L. R. 2d* 1418 (*Sup. Ct.* 1951).

The State replies that the accused "asserts the basic Constitutional protection gathered from the Fifth Amendment" to the Federal Constitution; that the cited cases "are all

decided under particular state statutes, and involve only civil issues"; that there is "no physician-patient privilege in New Jersey," and the accused's "difficulty here is that he waived whatever constitutional privilege he had over the Spradley testimony by becoming a witness in his own behalf."

It is said in argument that if the accused "could waive his own privilege, by testifying on his own behalf in defense," *Raffel v. United States*, 271 *U. S.* 494, 46 *S. Ct.* 566, 70 *L. Ed.* 1054 (1926), "then, *a fortiori*, he waived the privilege held over the supposed agent, Dr. Spradley"; that the accused "testified fully, as did his expert, concerning a state of alleged amnesia before, at, and after the crime," and "the witness contradicted this testimony on rebuttal." To sustain the theory of waiver of privilege, *In re Selser*, 15 *N. J.* 393, 404 (1954), and *State v. Auld*, 2 *N. J.* 426 (1949), are invoked.

█ Dr. Spradley and the defendant did not bear to one another the relation of physician and patient; it was not contemplated that the psychiatrist would treat or prescribe a course of treatment for the accused, such as would be deemed needful or prudent after a professional examination and diagnosis; the psychiatrist was retained by the accused's attorneys to inquire into his mental condition and competence, with particular relation to the time of the lethal acts, and to impart to his attorneys the benefit of his expert judgment and experience for their use in the preparation and presentation of the defense; and the communications made by the accused to the psychiatrist in response to his interrogation as to the circumstances of the fatality and matters bearing upon his mental processes, and so also the consequent mental diagnosis and opinion, are privileged, just as much so as if the revelations had been made by the accused directly to his attorneys. The privilege extends to the necessary intermediaries and agents through whom the communications are made. And it includes communications between the attorney and a scientific expert retained to aid in the presentation of the defense, a confidential employment. See *Annotation*, 139 *A. L. R.* 1256. The principle is of the essence of the

ancient common-law attorney-client privilege, in this country and in England and the continental countries deemed a basic civil right, indispensable to the fulfillment of the constitutional security against self-incrimination and the right to make defense with the aid of counsel skilled in the law. See *In re Selser, supra.*

Such is the rationale of the California cases of *Webb v. Francis J. Lewald Coal Co., supra,* and *City and County of San Francisco v. Superior Court, supra.* And in the Minnesota case of *Schmitt v. Emery,* the basic concept is stated thus:

"Because it is often necessary for clients to communicate with their attorneys with the assistance or through the agency of others, as well as by their own personal action, the privilege extends to a communication prepared by an agent or employee, whether it is transmitted directly to the attorney by the client or his agent or employee. * * * Where a document is prepared by an agent or employee by direction of the employer for the purpose of obtaining the advice of the attorney or for use in prospective or pending litigation, such document is in effect a communication between attorney and client. The client is entitled to the same privilege with respect to such a communication as one prepared by himself. The agent or employee as well as the attorney is prohibited from testifying with respect thereto without the client's consent."

The rule is exemplified in the English cases of *Ankin v. London and N. E. Ry. Co., L. R.* (1930), 1 *K. B. Div.* 527; *The Hopper No. 13* (1925), *L. R. Prob. Div.* 52; and more recently in *Westminster Airways, Ltd. v. Kuwait Oil Co., Ltd.* (1951), 1 *K. B.* 134, 22 *A. L. R. 2d* 648. And see annotation in 139 *A. L. R.* 1250.

In New Jersey, the late Court of Errors and Appeals held privileged a communication made by the accused to a fellow prisoner acting as his amanuensis in writing a letter to employ a lawyer for his defense, as a "confidential" employment "for the purpose of effecting a communication from [the defendant] to his intended lawyer to engage and instruct him"; and it was immaterial that the lawyer had not been previously employed. *State v. Loponio,* 85 *N. J. L.* 357 (*E. & A.* 1913).

■ The privilege is an accommodation of competing public interests, the ascendency for compelling policy reasons

of the protection from unauthorized disclosure of communications between attorney and client over general testimonial duty and compulsion in the interest of truth and justice. The attorney-client privilege is basic to a relation of trust and confidence that, though not given express constitutional security, is yet essentially interrelated with the specific constitutional guaranties of the individual's right to counsel and immunity from self-incrimination, the oldest of the privileges for confidential communications, going back to the reign of Elizabeth where it stood unquestioned, "as a natural exception to the then novel right of testimonial compulsion." *Wigmore on Evidence* (3d ed. 1940), *section* 2190.

The essential policy of the privilege is grounded in the subjective consideration of the client's freedom from apprehension in consulting his legal advisor, assured by removing the risk of disclosure by the attorney even at the hands of the law, *Wigmore, Evidence* (3d ed. 1940), *section* 2291. Lord Eldon said that what at the outset was regarded as the attorney's privilege came to be "the privilege of the client and the public." *Wright v. Mayor,* 6 *Ves. Jr.* 281 (1801). The individual interest outweighs the public concern in the search for truth. The foundation of the rule is "out of regard to the interests of justice, which cannot be upholden, and to the administration of justice, which cannot go on without the aid of men skilled in jurisprudence, in the practice of the courts, and in those matters affecting rights and obligations which form the subject of all judicial proceedings." *Greenough v. Gaskill,* 1 *Myl. & K.* 98, 103 (1833). Without secrecy of communication there cannot be the "unrestricted and unbounded confidence in the professional agent" which is essential to the administration of justice. *Anderson v. Bank, L. R.* 2 *Ch. D.* 644, 649 (Jessel, M. R. 1876). The privilege is vain if it does not secure freedom of professional consultation. Unless the confidence be inviolate, there will of necessity be restraints upon communication working grievous injury and injustice. The

solemn obligation of secrecy is inherent in the essential right to counsel.

In the cited English case of *Westminster Airways, Ltd. v. Kuwait Oil Co. Ltd.,* a suit for damages caused by defendant's truck which ran into the plaintiff's airplane after it had made a forced landing on a highway, the defendant made an "affidavit of documents," consisting of communications between the insured defendant and its indemnity insurer and insurance brokers after it had become clear beyond doubt that the plaintiff would make a claim against the defendant for the ensuing damages; and the plea of privilege was sustained as including, not merely communications made to the professional agent himself by the client directly, but also communications made by the client to the solicitor through intermediate agents.

The annotation to the case in 22 *A. L. R. 2d* 660 shows it to be the general rule that a report or other communication made by an insured to his liability insurance company, concerning an occurrence that may give rise to a claim against him under the policy, is privileged as one between attorney and client, if the policy obliges the insurer to defend him through its own attorney and the communication is intended for the information or assistance of the attorney in making such defense.

■■ And it is a corollarial consequence of these considerations that the accused did not waive the privilege by becoming a witness in his own behalf. The privilege is designed to secure the client's confidence in the secrecy of his communications; and so it is that the "client's offer of his *own testimony* in the cause *at large* is not a waiver, for the purpose either of cross-examining him to the communications or of calling the attorney to prove them; otherwise the privilege of consultation would be exercised only at the penalty of closing the client's own mouth on the stand"; and the "client's offer of his *own testimony* as to *specific facts* about which he has happened to communicate with the attorney is not a waiver," for the same reason; "but his offer of the *attorney's testimony* as to such specific

facts is a waiver, * * *." *Wigmore, Evidence, section* 2327.

Involuntary waiver by taking the witness stand in one's own defense would subvert the privilege of the confidential relation, rooted in basic societal policy as well as individual right.

## III.

And it is also assigned for error that on cross-examination the accused was obliged to testify, over objection, to the "commission of previous crimes of which he had not been convicted," that is to say, he "had stolen an automobile" and "had written a number of bad checks and forged some," and the county prosecutor "announced that he would prove that the defendant stole a social security card."

The State affirms that the testimony was not elicited "to show conviction of crime, but solely to affect the defendant's credibility"; that it was "the 'good faith' and simple veracity of the defendant with which the State was concerned in propounding the several questions * * *," and not " 'malice' or 'ill will' toward the decedent, *State v. Lederman,* 112 *N. J. L.* 366 (*E. & A.* 1934), or to develop a common 'scheme' or 'plan,' *State v. Noel,* 102 *N. J. L.* 659 (*E. & A.* 1926), or to show that the defendant committed other crimes of a like nature, *Bullock v. State,* 65 *N. J. L.* 557 (*E. & A.* 1900), tending to prove the accused would be likely to commit the crime now charged against him."

In brief, it is submitted that the theft of the automobile was opposed to the accused's testimony that he "hitch-hiked" from Milwaukee to his home in Bethlehem, the "plain meaning of this mode of travel" not "connoting the theft of an automobile as the means of making a part of the total journey," and his "credibility" was "properly affected by this series of questions designed to show that his story on this point was not in 'good faith.' " So also, the accused's concession that he "used aliases in various jobs in California, because he was worried about a parole officer in Allentown, Pa., growing out of a probation then existing on an earlier conviction," justified the State in "showing the true motive,

the defendant's lack of 'good faith,' the absence of credibility on these points, when it developed that he actually pilfered social security cards of living people." And it is said that the "passing of checks and the forging of others were all proper inquiries in the development of the entire narrative of events, which finally brought the defendant to the locale of the murder scene," and "Here, surely, was the 'motive to falsify,' the 'bias,' by which the defendant, on a limited direct examination, hoped to exclude part of the narrative of events."

In sum, the State's argument is that the "entire series of questions about stolen social security cards, a stolen automobile, the making and forging of worthless checks, were proper attacks on the defendant's credibility generally, and particularly demonstrated his lack of 'good faith,' as well as his 'motive' in developing his life story prior to the murder."

By statute, a "conviction of any crime may be shown by examination or otherwise" for the "purpose of affecting the credibility of any witness * * *." *N. J. S.* 2A:81–12. And on a trial for crime it is not competent to prove that the accused "committed other crimes of a like nature for the purpose of showing" that he "would be likely to commit the crime charged in the indictment," save where the "knowledge, good faith, motive or intent of a party is material, on which evidence collateral to the main subject is sometimes admitted; but the competency of such evidence is limited to facts which are so connected with the subject in controversy as to make it apparent that the party had a common purpose in both transactions"; "on the trial of a criminal charge it is not relevant to show that the defendant has committed other similar crimes which are not connected in any way with the one in question." *Bullock v. State, supra,* Depue, C. J.

There are exceptions to the general rule that upon the trial of a person for one crime "evidence that he has been guilty of other crimes is irrelevant," related to opportunity, motive, intent, a particular element of the crime charged,

and the like, as (a) when the "circumstance of the crime charged and those of an extraneous crime indicate that they were both committed by the same person"; (b) when the accused's "perpetration of an extraneous crime shows that he had the opportunity of committing the crime in issue"; (c) when "the several crimes may have sprung from a single motive, aiming at the accomplishment of the same end"; (d) when the commission of a different offense "discloses a motive for the commission of the offense charged, *e. g.*, the defendant's adultry with a wife may be relevant on his trial for the murder of her husband"; (e) when "one crime may have been perpetrated as a preparation for, or means of committing, concealing or escaping from another"; (f) when the "acts charged to be criminal may reasonably be innocent, and are criminal only when performed with a certain intent or with knowledge of a certain fact," in which case "other acts of the defendant, though criminal, may be adduced to prove that he had such specific intent or knowledge," *e. g.* "utterance of counterfeits, the making of false pretenses, the reception of stolen goods, the publication of libels, and, probably, occurrences claimed by the defendant to be accidental"; and (g) "in general it may be said that whenever the defendant's guilt of an extraneous crime tends logically to prove against him some particular element of the crime for which he is being tried, such guilt may be shown." Yet "it must not be supposed that the defendant's propensity to commit crime, or even to commit crimes of the same sort as that charged, can be put in evidence to prove his guilt of the particular offense, for however reasonable would be the deduction that, when a pocket is picked in a group of persons, of whom only one is addicted to picking pockets, he is the offender, his singularity in this respect could not, under our legal theory, figure as proof of his guilt; there must appear, between the extraneous crime offered in evidence and the crime of which the defendant is accused, some other real connection, beyond the allegation that they have both sprung from the same vicious disposition." *State v. Raymond,* 53 *N. J. L.* 260, 264

(*Sup. Ct.* 1891), Dixon, J. See also *State v. Lederman, supra; State v. Noel, supra; State v. Lanto,* 98 *N. J. L.* 401 (*Sup. Ct.* 1923), affirmed 99 *N. J. L.* 94 (*E. & A.* 1923); *State v. De Paola,* 5 *N. J.* 1 (1950).

█ And such evidence is not competent or relevant on the issue of the character of the accused. *Bullock v. State, supra; State v. Henson,* 66 *N. J. L.* 601 (*E. & A.* 1901), Van Syckel, J.

"[Conduct derogatory to the witness' character] may be proved provided it does not raise or tender a collateral issue. Thus, it may be proved that a proposed witness has been convicted of an infamous offense, by producing the record. That raised no collateral issue of fact, as the record is conclusive, and there can be no further inquiry. But it is not competent to prove that the witness has in fact committed a crime, if he has not been convicted, although the actual perpetration of the crime is what renders him unworthy of belief. That, if permitted, might raise a collateral issue for trial." *People v. Jackson,* 3 *Park. Cr.* 396.

See *Wigmore, Evidence, section* 980; also *Roop v. State,* 58 *N. J. L.* 479 (*Sup. Ct.* 1896); *State v. Barker,* 68 *N. J. L.* 19 (*Sup. Ct.* 1902); *State v. Bossone,* 88 *N. J. L.* 45 (*Sup. Ct.* 1915), affirmed 89 *N. J. L.* 724 (*E. & A.* 1916); *State v. Juliano, supra.*

At common law conviction of certain offenses rendered the accused incompetent to testify, because the convict was considered infamous. Pardon restored competency; but the conviction was still provable to affect the credit of the witness—for a pardon "makes not the man always an honest man." 2 *Hale P. C.* 278; *King v. Crosby,* 5 *Mod.* 15; *Curtis. v. Cochran,* 50 *N. H.* 242. At the outset, it was the infamous punishment that disqualified, but later on it was the character of the crime that served as the test. *King v. Davis,* 5 *Mod.* 75. For the history, see Collins, J. in the dissenting opinion in *State v. Henson, supra.* See also *State v. Salimone,* 19 *N. J. Super.* 600 (*App. Div.* 1952) Eastwood, J., certification denied 10 *N. J.* 316 (1952); 7 *Rutgers L. Rev.* 266.

█ It was error to receive the evidence of prior crimes of which the accused had not been convicted.

## IV.

(a) There was no error in the admission into evidence of the photographs of the body of the deceased. These exhibits are within the rule of *State v. Huff*, 14 *N. J.* 240 (1954). See *State v. Myers*, 7 *N. J.* 465 (1951).

(b) Apropos of the testimony of the witness Umholtz of admissions made to him by the accused, not committed to writing, testimony said to be at variance in a vital particular with that given by the witness at the earlier trial, we think the county judge erred in refusing to charge the request that the jury "should receive, weigh and consider such evidence with caution," in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer.

There are inherent weaknesses in this character of testimony: faulty memory, the danger of error in understanding and repetition. Such are the reasons for the rule. *Bankers Trust Co. v. Bank of Rockville Center Trust Co.*, 114 *N. J. Eq.* 391, 400 (*E. & A.* 1933). "All verbal admissions" of the accused "are received with caution." *Wilson v. United States*, 162 *U. S.* 613, 16 *S. Ct.* 895, 40 *L. Ed.* 1090 (1896).

"Aside from the danger of fabrication, verbal admissions are regarded as unreliable evidence, because experience shows that they are frequently misunderstood, imperfectly remembered, and inadvertently made." *Tousey v. Hastings*, 194 *N. Y.* 79, 86 *N. E.* 831 (*Ct. App.* 1909).

There is a "general distrust of testimony reporting any extra-judicial *oral statements* alleged to have been made, including a party's admissions"; the "great possibilities of error in trusting to recollection-testimony of oral utterances, supposed to have been heard, have never been ignored; but an antidote is constantly given by an instruction to the jury against trusting overmuch the accuracy of such testimony"; "Verbal precision is of course important to the correct understanding of any verbal utterance, whether

written or oral, because the presence or absence or change of a single word may substantially alter the true meaning of even the shortest sentence." *Wigmore, Evidence, sections* 1056, 2094. See 31 *C. J. S., Evidence,* § 382, *p.* 1178. In *Tilton v. Beecher,* 2 *Abbott's Rep.* 837 (1875), Mr. Justice Neilson remarked:

"Perhaps the best statement of [the general principle] has been given in *Starkie on Evidence*, to the effect that this kind of testimony is dangerous, first, because it may be misapprehended by the person who hears it; secondly, it may not be well-remembered; thirdly, it may not be correctly repeated."

See also *Earle v. Picken,* 5 *C. & P.* 542 (1833).

Here, as we have said, there is a claimed discrepancy between the testimony given by the witness on this and the first trial.

■■■ (c) The contention was made that the accused "blacked out sometime before" the time of the alleged crime, "and had no recollection of having committed the crime or having given the statements to the State Police," also that he was suffering from "amnesia at the time the crime was committed," and "under that state of mind, he was acting subconsciously, and could not, therefore, form a conscious intent"; and the county judge was requested to instruct the jury that if it appeared from the evidence that "during any of the time when it is alleged that the defendant committed the crime with which he is charged, he had no conscious volition to commit the crime or any element of the crime in which intent is necessary, then you must acquit him."

But the requisite intent, both as to first-degree murder and the underlying statutory felony, was charged in clear and explicit terms, not once but several times; and there is no cause for complaint that the instruction was not given in the terms of the request, if the subject matter was charged in substance. For instance, the jury were told that "felonious intent" is a requisite element of robbery, and "this intent" the State must prove beyond a reasonable doubt. And the

intent and the other elements of willful, deliberate and premeditated murder were charged in equally positive terms; also that "where an act becomes criminal by reason of the intent with which it is done, such intent must be proved."

Counsel insists there was no instruction as to the "absence of a 'conscious' intention." While the particular adjective was not used, the instruction given covered the substance of the request in ample and comprehensible terms, and there is no suggestion of prejudice to the accused in this regard. See *State v. Bunk*, 4 *N. J.* 461 (1950); *State v. Lynch*, 130 *N. J. L.* 253 (*E. & A.* 1943); *State v. Carrigan*, 93 *N. J. L.* 268 (*Sup. Ct.* 1919).

The judgment is accordingly reversed; and a new trial directed.

VANDERBILT, C. J. (dissenting in part). The majority opinion reverses the conviction below, among other reasons, for want of technical, but not substantial, compliance with certain provisions of *N. J. S.* 2A:74–9 and 10, in drawing the jury in a murder case. The majority deems it fatal that the sheriff failed to draw from the general panel a list of at least 48 jurors "or such larger number as is directed by special order of the court." A list of 48 jurors is obviously carried over from earlier and simpler days; in these days it is not a realistic number from which to draw a jury for a murder case where 20 peremptory challenges are allowed the defendant and 12 are allowed to the State, *N. J. S.* 2A:78–7. Special orders for additional jurors in considerable numbers are common; thus in *State v. Mohr*, 99 *N. J. L.* 124 (*E. & A.* 1923), the original order was for 60 jurors and a week later there was another order for 120 more.

In the case at bar, instead of the sheriff drawing a list of 48, the defendant was served with a list of 75 jurors drawn from the general panel. It is important to note the care with which the general panel in every county is now chosen. The two jury commissioners in each county, appointed by the Supreme Court on a bipartisan basis, *N. J. S.* 2A:68–1, select the names for the petit jury list for each

stated session in the Superior Court and deliver it to the assignment judge at least 40 days before the stated session, *N. J. S.* 2*A* :70–1. In preparing the jury list not only must the jury commissioners make use of a detailed uniform questionnaire prepared by the Supreme Court and send it to each prospective juror, *R. R.* 1 :29–2 and *N. J. S.* 2*A* :70–5, but at least 35 days before each stated session the jury list is "closely" checked by the assignment judge and the county judges and the jury commissioners "for the purpose of removing from such lists the names of such persons as may, in their opinion, be unfitted for jury service. The assignment judge may, in his discretion, strike from such lists the name of any person," *N. J. S.* 2*A* :70–2.

Then, not more than 15 days before each stated session, the jury commissioners submit uniform metal or plastic pieces bearing numbers corresponding to the numbers of the persons on the jury list to the assignment judge, or a judge designated by him, who examines the pieces and if they are found correct returns them to the jury commissioners, who thereupon deposit them in the jury box, *N. J. S.* 2*A* :71–1. The box is then "shaken so as to mix thoroughly the pieces therein," and in the presence of the designated judge the names are drawn singly from the box and the name, occupation and place of abode of each juror is publicly announced. *N. J. S.* 2*A* :71–2. This process of selecting jury panels is a far cry from the drawing of jurors by a sheriff in the days when *N. J. S.* 2*A* :74–9 and 10, the statute now before us, was first enacted.

It is difficult to see, under this practice, how the drawing of 48 or more names by the sheriff from the general panel in the presence of the county judge or the clerk adds anything to the protection of the defendant in addition to the safeguards providing for the drawing of petit jury panels under the statutes and rules herein cited. In fact, the safeguards provided by these modern statutes and rules reduce the requirement of the sheriff drawing a jury of 48 or more to a mere ministerial level. It is as outmoded as the use of "persons of the body of his county" (*i. e.,* talesmen)

commanded by the same section of the statute, *N. J. S.* 2A :74–9. Yet the majority deems the drawing of the jury by the sheriff and the service on the defendant as mandatory, indeed, as jurisdictional, and for lack thereof it reverses. The majority takes this view in spite of the fact that in case after case the courts, in construing this obscure and troublesome statute, have held that its purpose is to give the defendant an effective right of challenge with respect to a jury panel of limited number rather than a strict compliance with the technical provisions of an inartistically drawn and outmoded statute. In considering the cases it should be noted that under *R. R.* 3 :7–2 (*a*) the defendant is required to be served—and in this case he was served— at least three days before the trial with a list of jurors to be used at the trial. Thus we find in *Patterson v. State,* 48 *N. J. L.* 381, at *page* 384 (*Sup. Ct.* 1886), the contention that all of the jury must be present at the commencement of the trial swept away:

"If it is necessary that every juror of the 48 summoned for service at the term should be present in court when a case is called for trial, it would be quite impossible to conduct the prosecution of criminal trials successfully."

and at *page* 383 of 48 *N. J. L.* the reason for the modern approach in statutory construction is clearly stated:

"In the early days of English criminal jurisprudence, when even a trifling larceny was punishable with death, there was reason why the judicial mind should exhaust its ingenuity in aid of the defense, and seize upon every technicality to avert from the prisoner a punishment so disproportionate to his crime. * * * The reason for resorting to mere technicality to enable the criminal to evade the sanctions of the law no longer exists, and the practice to which that reason led should therefore cease."

The *Patterson* case was cited and approved by the Court of Errors and Appeals in *Brown v. State,* 62 *N. J. L.* 666, at *page* 691 (1898), where 11 jurors were not found, two were unable to attend by reason of illness and three were absent without excuse, and in *State v. Martin,* 94 *N. J. L.*

139 (1919) where 16 jurors failed to answer when their names were drawn. See also *State v. Mohr*, 99 *N. J. L.* 124, at 126 (*E. & A.* 1923) *supra*, where Chief Justice Gummere stated succinctly the object of the statute under review:

"Its primary purpose is to protect the interests both of the defendant and of the state by providing a panel of jurors sufficient in number to afford each party the opportunity of exercising the right of challenge to its fullest extent, without being compelled to resort to talesmen by reason of the exhausting of the panel; and it should be so construed as to effectuate that purpose."

The same holding is reiterated in *State v. Cioffe*, 128 *N. J. L.* 342 (*Sup. Ct.* 1942), affirmed on the point here made on the opinion below in 130 *N. J. L.* 160 (*E. & A.* 1943), the court adding

"In this case it is not claimed that plaintiffs in error were prejudiced in any way."

In the case before us it must be remembered that the defendant did not exhaust his peremptory challenges on the jury list of 75 which was furnished him in advance of trial pursuant to *R. R.* 3:7–2(*a*). To the same effect is *State v. Simmons*, 120 *N. J. L.* 85, 88 (*E. & A.* 1938), where the court said with respect to a challenge at the drawing of the special panel in a murder case:

"We therefore think there was no irregularity in the present case, but, even if there was, the general rule is that statutory provisions respecting the preparation of lists and the drawing of the panel are regarded as directory only, and that irregularities therein are no ground of challenge, unless they are such as plainly operated to prejudice the challenging party."

The majority opinion relies on *State v. Lapp*, 84 *N. J. L.* 19 (*Sup. Ct.* 1913) and *State v. Rombolo*, 89 *N. J. L.* 565 (*E. & A.* 1916). The *Lapp* case does not concern the present statute, the charge there being for grand larceny, but in any event both cases are clearly correct. In each

case the sheriff failed to put into the box all of the names available to him under the appropriate statute in each case, but instead of so doing proceeded in one case to the general panel and in the other case to talesmen. These two decisions are grounded in the principle that the intent and purpose of the statutes governing jury selection is to secure for the accused a fair and impartial trial and afford him, and the State as well, an opportunity of adequate inquiry into the qualifications of those who will sit in judgment. In each of these cases the conduct complained of was clearly violative of this purpose and prejudicial to the defendants, a fact which does not exist in the instant case.

The majority also relies on *State v. Tomassi,* 75 *N. J. L.* 739, at *page* 743 *(E. & A.* 1908), where it was stated:

"Manifestly the formality of drawing the list of 48 jurors to be served upon the defendant is required only when the general panel consists of more than that number, the drawing being intended for the purpose of selecting 48 names out of a greater number. Where the general panel consists of more than 48, the drawing is essential. * * * where the general panel consists of 48, and has not been reduced, the statute does not require the idle form of putting the 48 names into a box for the mere purpose of drawing out the same names."

But if the drawing of a list by the sheriff of 48 names (or more, if the court so orders) is mandatory or jurisdictional and therefore may not be waived as the majority opinion asserts now, in the absence of statutory authority—and there is none—may it be waived in cases of general panels of 48? Does the *Tomassi* case not demonstrate that the requirement is really not mandatory or jurisdictional, but simply, as the cases quoted prove, one designed to give the defendant an opportunity to investigate adequately his prospective jurors? And do not the steps which are now taken in the choice of a general panel demonstrate that he is given that very opportunity? What was done in the case at bar in nowise derogated from a fair and impartial trial to the defendant. On the contrary, he was given every substantial safeguard. As a practical matter, 48 jurors is not a sufficient number

in most murder cases to furnish a trial jury of 14. A list of 75 is much more realistic than a list of 48. If 48 is not sufficient and 75 is more realistic, the course pursued here gave the defendant an opportunity which he would not have had under a list of 48 to make a thorough investigation of the more realistic number of jurors. Barring a showing of prejudice or a possibility of prejudice stressed in the *Cioffe* case and the *Simmons* case, *supra,* we ought not to condemn the practice followed. Thus, for example, if the same jury had been repeatedly used in murder cases, there might be a possibility of asserting prejudice, but the instant case was the first case in which the panel of 75 had ever been called on to do jury service. In such circumstances no prejudice could possibly exist.

One of the great objectives of modern procedure is to make it a means to an end rather than an end in itself. Every time a statute or a rule is construed to be mandatory or jurisdictional we are in danger of promoting technicalities at the expense of substantial justice. The latest instance of the application of this principle to civil cases was in the recent opinion of this court in *Meszaros v. Gransamer,* 23 *N. J.* 179 (1957). The principle is quite as important in the administration of criminal justice as it is in civil cases.

The difficulties involved in the drawing of jury panels in Atlantic County are unique because Atlantic County is the only county in which the courts sit in two different places—in Mays Landing for criminal cases and in Atlantic City for civil cases. The two places are 20 miles apart. Manifestly, the same panel cannot sit in both places at the same time. The present case suggests the necessity of an administrative study of the entire problem of jury assignments in Atlantic County, but no possible difficulties that may be suggested have any bearing on the jury assigned to criminal work in Atlantic County with respect to its first case of jury duty on a murder indictment.

I would not reverse the judgment below on the first ground assigned in the opinion of the majority.

Mr. Justice WACHENFELD and Mr. Justice JACOBS have authorized me to indicate that they join with me in this dissent.

VANDERBILT, C. J., and WACHENFELD and JACOBS, JJ., concurring in result.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and WEINTRAUB—7.

*For affirmance*—None.