**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0315-18

STATE OF NEW JERSEY

    Plaintiff-Respondent,

v.

REYMOND PAGAN,
a/k/a REYMOND C. PAGAN,
and RAYMOND C. PAGAN,

    Defendant-Appellant.

_____

Submitted February 22, 2021 – Decided May 26, 2021

Before Judges Fasciale and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-04-1216.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele A. Adubato, Designated Counsel, on the brief)

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Jason Magid, Special Deputy Attorney General/Acting Assistant Prosecutor and Rachel M. Lamb, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant appeals from his jury trial convictions for felony murder, aggravated manslaughter, robbery, and related weapons offenses. He contends the trial court erred in denying his motion to suppress incriminating text messages that were extracted from a co-defendant's cell phone. He also contends the trial court made several errors that individually and collectively warrant a new trial, and that he received an excessive sentence. After carefully reviewing the record in light of the applicable legal principles, we affirm.

I.

In April 2016, a Camden County grand jury charged defendant with: first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree knowing/purposeful murder, N.J.S.A. 2C:11-3(a)(1) and (2); first-degree robbery, N.J.S.A. 2C:15-1(a)(1); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree certain persons not to have a weapon, N.J.S.A. 2C:39-7(b).

In April 2017, Judge John T. Kelley denied defendant's motion to suppress evidence after an evidentiary hearing. Judge Kelley presided over the jury trial,

A-0315-18

which occurred over the span of six days in April 2018. The jury returned a guilty verdict on all counts except for first-degree knowing/purposeful murder, instead finding defendant guilty of the lesser offense of aggravated manslaughter, N.J.S.A. 2C:11-4(a). Defendant was sentenced on his first-degree felony murder conviction to a fifty-year prison term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The convictions for first-degree aggravated manslaughter, first-degree robbery, and second-degree possession of a weapon for an unlawful purpose were merged into the first-degree felony murder conviction for sentencing purposes. The sentencing court also sentenced defendant to a term of eight years for his second-degree conviction for unlawful possession of a weapon, to run concurrently with the fifty-year felony murder sentence. The court further sentenced defendant to a term of eight years with a five-year period of parole ineligibility for his second-degree conviction for certain persons not to have a weapon, to be served consecutively with the fifty-year felony murder sentence. The aggregate sentence imposed by the court was thus fifty-eight years, with a forty-seven-and-a-half-year period of parole ineligibility.

We discern the following facts from the record. On September 27, 2015, at approximately 11:33 p.m., Camden County police responded to a report of a

shooting. The victim, Jose Franco, was found lying on the ground in a pool of blood. He was transported to Cooper University Hospital where he succumbed to his gunshot wound the following morning.

At approximately 11:44 p.m.—just minutes after police had responded to the shooting—Officer Lissandra Sime and Detective Sean Miller were dispatched to Cooper University Hospital to investigate a report of an individual, co-defendant Samuel Lopez,[1] who came to the emergency room with a gunshot wound to his left thigh. Lopez claimed he was the victim of a robbery. He responded evasively to questions and provided inconsistent accounts when asked for specific details about what happened. Officer Sime overheard Lopez state to a family member, "[t]hat mother-fucker [Franco] is shot and I'm just going to walk out of here with a cast on."[2] Franco, it bears noting, was at that moment in a nearby bay of the hospital trauma unit being treated for his fatal gunshot wound. The police seized Lopez's cell phone and clothing. The bullet

---

[1]  Lopez was tried separately and is not a party to this appeal. We affirmed Lopez's conviction in State v. Lopez, No. A-1210-19 (App. Div. Sept. 23, 2020).

[2]  The account of Officer Sime, who acted as a translator during Lopez's questioning, was presented only at the suppression hearing for the purpose of supporting the State's argument that Lopez's cell phone had been legally seized. At trial, the State presented to the jury Detective Miller's testimony, which substantially matched Officer Sime's account, sans Lopez's comment to his family member.

A-0315-18

holes and powder burn markings indicated a gun had been discharged from inside his left pants pocket. Lopez is left-handed.

The following day detectives met with Franco's cousin, who stated that he last saw Franco at approximately 11 p.m. on the night of shooting. The cousin provided information about Franco's usual route of travel home. Detectives followed that route to look for potential witnesses and video surveillance cameras.

The detectives learned from a Camden County police patrolman that the owner of a liquor store had reported two individuals loitering across the street around the time of the shooting. Detectives followed Franco's route, eventually finding a large pool of blood adjacent to a curb approximately two blocks from where police had found Franco. The detectives canvassed the area for witnesses.

The detectives also obtained video surveillance footage from a restaurant located approximately two blocks from where the pool of blood was discovered. This video showed Franco crossing a nearby street, followed by two men wearing dark hooded clothing and gloves. From the video, police could see one suspect wearing sneakers with distinctive black and blue markings and one suspect with a large beard. Police executed a warrant to search Lopez's residence, where they recovered a pair of black and blue Nike high top sneakers.

5

The detectives also obtained a security video recording from Cooper University Hospital documenting Lopez's arrival and treatment. This video confirmed that Lopez's build, facial structure, and dark clothing were consistent with the other video footage detectives had collected. The hospital video recording showed Lopez arriving in a vehicle that was registered to defendant's girlfriend. She testified that on the night of the shooting, defendant called and told her to pick up Lopez from a basketball park in the Cramer Hill section of Camden. She transported Lopez to Cooper Hospital because "he got something in the leg." She later found a sweatshirt on the backseat of her vehicle that did not belong to her or her children, which she gave to police.

Defendant's girlfriend further testified that she saw Lopez a few days later while she was with defendant. Defendant told Lopez, "the guy death [sic]." At the time, she did not know who they were talking about. Defendant later told her that Lopez received his gunshot wound when the two of them were "robbing in Cramer Hill."

The State presented text messages between defendant and Lopez. On September 26, 2015, a text from defendant to Lopez read, "We need to make a mark. I got an idea." Lopez responded, "Where you want to hit?" Defendant

responded, "Everywhere, just don't [know] where to start. I want to get a hustler."

At 8:52 p.m. on the night of the shooting, defendant texted Lopez, "I'll be there in [fifteen] min. You still down, right?" At 8:59 p.m., defendant texted Lopez "I'll be there in [five]. You ready?" At 9:03 p.m., Lopez responded affirmatively. At 9:04 p.m., defendant texted Lopez "I'm here" and "I got to get the thing. It's nearby."

Lopez testified on defendant's behalf. He claimed the text messages were about selling marijuana. Lopez testified that he met with defendant for five to ten minutes around 9 p.m. on the night of the shooting but did not see him again that night. He further testified that after he was shot, he called defendant to ask him to call an ambulance. He confirmed that defendant's girlfriend picked him up at the basketball park and transported him to the hospital. Lopez admitted that he was wearing black and blue Nike "LeBron's" that day but denied he had ever seen the pair of black and blue Nike high top sneakers seized from his apartment.

The appellate brief submitted by defendant's counsel raises the following points for our consideration:

POINT I

THE DEFENDANT'S MOTION TO SUPPRESS THE WARRANTLESS SEIZURE OF MR. LOPEZ'S CELL PHONE AT THE HOSPITAL AND ALL OF THE INFORMATION DERIVED THEREFROM AS FRUIT OF THE POISONOUS TREE SHOULD HAVE BEEN GRANTED

POINT II

THE TESTIMONY OF DETECTIVE MILLER EXPRESSING AN OPINION ABOUT THE CREDIBILITY OF CO-DEFENDANT, SAMUEL LOPEZ, WAS IMPERMISSIBLE OPINION TESTIMONY WHICH REQUIRES REVERSAL OF DEFENDANT'S CONVICTION (not raised below)

POINT III

THE FAILURE OF THE TRIAL COURT TO GIVE HAMPTON AND KOCIOLEK JURY INSTRUCTIONS WAS PLAIN ERROR (not raised below)

POINT IV

THERE WAS INSUFFICIENT RELIABLE EVIDENCE TO SUPPORT THE DEFENDANT'S CONVICTIONS BEYOND A REASONABLE DOUBT (not raised below)

POINT V

THE AGGREGATE SENTENCE IMPOSED UPON MR. PAGAN OF 58 YEARS WITH 47.6 YEARS OF PAROLE INELIGIBILITY WAS EXCESSIVE AND SHOULD BE REDUCED

POINT VI

THE AGGREGATE ERRORS DENIED DEFENDANT A FAIR TRIAL (not raised below)

8

Defendant raises the following additional points in his pro se supplemental brief:

> POINT I
> THE TRIAL COURT'S IMPROPER ADMISSION OF THE TEXT MESSAGES BETWEEN DEFENDANT AND HIS CO-DEFENDANT WITHOUT CONDUCTING A PROPER ANALYSIS OF THE EVIDENCE DEMANDS REVERSAL OF THE DEFENDANT'S CONVICTION
>
> POINT II
> IT WAS PLAIN ERROR TO CHARGE FIRST DEGREE MURDER WHERE NO BASIS IN THE RECORD EXISTED TO GIVE SUCH A CHARGE THAT GIVEN OF THE CHARGE [sic] RESULTED IN A COMPROMISE VERDICT CAUSING AN UNJUST RESULT

II.

We first address defendant's contention that police unlawfully seized Lopez's cell phone while he was receiving treatment at the hospital for his self-inflicted gunshot wound, and that the incriminating text messages between defendant and Lopez extracted from the phone should have been suppressed as a fruit of the unlawful seizure.[3] Because we affirm the denial of defendant's

---

[3] The Camden County Prosecutor's Office obtained a Communications Data Warrant (CDW) to extract data from Lopez's cell phone police that had been

9

motion to suppress substantially for the reasons explained by Judge Kelley in his thorough and cogent oral opinion, we need not readdress defendant's arguments at length. We add the following comments.

When reviewing a motion to suppress evidence, we "must uphold the factual findings underlying the trial court's decision, so long as those findings are 'supported by sufficient credible evidence in the record.'" State v. Evans, 235 N.J. 125, 133 (2018) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). "An appellate court 'should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Elders, 192 N.J. 244. Relatedly, a trial judge's credibility determinations should be upheld if such determinations are supported by sufficient credible evidence. State v. S.S., 229 N.J. 360, 374 (2017).

As we have noted, the prosecutor obtained a CDW before examining data contained in Lopez's cell phone, thus complying with the rule established by the United States Supreme Court in Riley v. California, 573 U.S. 373, 386, 403

---

seized without a warrant at the hospital on the night of the shooting. The prosecutor also obtained CDWs to search the contents of another cell phone belonging to Lopez and a phone belonging to defendant. The lawfulness of the seizures and searches of those other cell phones is not at issue in this appeal.

(2014) ("Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant."). The sole issue before us is whether there was a lawful basis to seize the phone at the hospital when the police seized Lopez's bullet-damaged pants. The State does not argue that the phone was seized incident to an arrest as in Riley. Rather, the State argues there were exigent circumstances sufficient to excuse the failure to obtain a warrant for the phone.

In State v. Johnson, our Supreme Court reaffirmed the bedrock principle that our constitutional jurisprudence favors warrants, and that warrantless searches or seizures are "presumptively unreasonable." 193 N.J. 528, 552 (2008) (citing Elders, 192 N.J. at 246). Accordingly, when police act without a warrant, the State in a motion to suppress "bears the burden of proving by a preponderance of the evidence not only that the search or seizure was premised on probable cause, but also that it 'f[ell] within one of the few well-delineated exceptions to the warrant requirement.'" Ibid. (quoting State v. Pineiro, 181 N.J. 13, 19–20 (2004)) (alteration in original).

"Exigent circumstances" is one of those recognized exceptions. The Court in Johnson explained that exigent circumstances cannot be precisely defined nor reduced to a "neat formula." Ibid. (citing State v. Nishina, 175 N.J. 502, 516

(2003)); see also State v. DeLuca, 168 N.J. 626, 632 (2001) ("'[t]he term "exigent circumstances" is, by design, inexact. It is incapable of precise definition because, by its nature, the term takes on form and shape depending on the facts of any given case.'") (quoting State v. Cooke, 163 N.J. 657, 676 (2000)). Consequently, the application of the exigent circumstances exception demands a "fact-sensitive, objective analysis." Johnson, 193 N.J. at 552 (citing State v. Bruzzese, 94 N.J. 210, 219 (1983)).

The Court in Johnson identified factors to consider when determining whether law enforcement officials faced exigent circumstances, including "the urgency of the situation, the time it will take to secure a warrant, the seriousness of the crime under investigation, and the threat that evidence will be destroyed or lost or that the physical well-being of people will be endangered unless immediate action is taken." Id. at 552–53; see also DeLuca, 168 N.J. at 632 ("Generally stated, circumstances are exigent when they 'preclude expenditure of the time necessary to obtain a warrant because of a probability that the suspect or the object of the search will disappear, or both.'") (quoting State v. Smith, 129 N.J. Super. 430, 435 (App. Div. 1974)).

Applying those tenets, we hold that the warrantless seizure of Lopez's cell phone was permissible due to exigent circumstances. The police had ample

probable cause to believe Lopez was involved in the shooting of Franco and that his cell phone might contain relevant evidence about that violent crime. Lopez's claim that he was the victim of a robbery raised suspicion given his inconsistent statements regarding his gunshot injury, his demeanor, and the condition of his jeans, which suggested that Lopez sustained a self-inflicted wound. Furthermore, the comments Lopez made about Franco that were overheard by Officer Sime clearly indicated his involvement in Franco's shooting. Although Franco was still alive when the phone was seized, the grave nature of his injuries establish that the crime under investigation was extremely serious. See Johnson, 193 N.J. at 552–53 (explicitly listing the seriousness of the crime under investigation as an exigency factor).

The officers also had a reasonable basis to believe that Lopez would remove or destroy the cell phone, or at least delete stored data if given the chance. As Judge Kelley found, "[t]he officer[s] feared that any possible evidence on Lopez's phone regarding the homicide or the cell phone itself may be destroyed before they could apply for a search warrant." The judge further found, "[i]t is unlikely the officers would have been able to telephonically apply for a warrant at 11 at night on a Sunday." We believe these findings are supported by sufficient credible evidence.

Defendant argues "there was no legitimate fear of destruction of property" because "it was a phone, and the phone companies maintain records." That argument is unconvincing and ignores the urgency of the spontaneous decision that needed to be made based on objective facts. A smart phone can store information, such as photographs, that might not be captured in phone service provider records. Furthermore, police in these circumstances are not precluded from acting swiftly to preserve digital evidence of a shooting on the grounds that it is possible that similar evidence might eventually be obtained from a different source. We believe the police acted appropriately to preserve evidence based on the information known to them at the moment of the seizure. Riley, 573 U.S. at 388 ("[The defendants] concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant. That is a sensible concession. And once law enforcement officers have secured a cell phone, there is no longer any risk that the [defendant] himself will be able to delete incriminating data from the phone.") (citations omitted).

In sum, we agree with Judge Kelley that it was objectively reasonable for the officers to act without delay in seizing the phone with the clothing to prevent the possible loss or destruction of evidence. We reiterate and emphasize that police showed appropriate respect for Lopez's constitutional rights by not

14

viewing information stored in the phone without first obtaining a CDW.  The seizure of the phone, while a constitutionally significant event, is less intrusive than a search of its contents and in this instance was justified by the swiftly developing circumstances of the nascent shooting investigation.  Cf. id. at 396–97 ("Indeed, a cell phone search would typically expose to the government far more than the most exhaustive search of a house:  A phone not only contains in digital form many sensitive records previously found in a home; it also contains a broad array of private information never found in a home in any form—unless the phone is.") (emphasis in original).

## III.

We next address defendant's contention—raised for the first time on appeal—that the trial judge erred in allowing a detective to testify before the jury as to the credibility of the explanation Lopez gave to police regarding his gunshot injury.  Defendant argues that Detective Miller gave impermissible opinion testimony as to the credibility of a defense witness, depriving defendant of a fair trial.  Specifically, Detective Miller testified:

> He [Lopez] was deceptive.  Like, if you're a true victim and someone tells me what happened, if I'm talking to you to tell me what happened, first of all as I'm talking to you give me eye contact, don't look away, don't say huh, I don't know what happened.  If someone has a gun in your face, I understand that you're scared but right

15

then and there tell me what happened. I'm the good guy[], I'm not – I'm not here to hurt you, I'm here to help you. But constantly saying huh and looking away and acting as if you're passing out, you know, from my training and experience you're being deceptive, something is not right.

Defendant did not object to the testimony at trial. We therefore hold the trial judge did not commit error—much less plain error—in failing to sua sponte strike that portion of detective's testimony and issue a curative instruction. In reaching that conclusion, we emphasize the plain error standard is demanding and aims to "provide [] a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error." State v. Bueso, 225 N.J. 193, 203 (2016). Indeed, as our Supreme Court noted in State v. Frost, "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." 158 N.J. 76, 84. See also State v. Nelson, 173 N.J. 417, 471 (2002) (holding that failure to object to testimony permits an inference that any error in admitting the testimony was not prejudicial). Our Supreme Court has repeatedly emphasized that "rerunning a trial when the error could easily have been cured on request would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal." State v. Singh, 245 N.J. 1, 13 (2020) (quoting State v. Santamaria, 236 N.J. 390, 404–05 (2019)).

16

Here, Detective Miller testified to the circumstances leading to the seizure of Lopez's phone and clothing. He did not comment on defendant Pagan's credibility. Moreover, the State's evidence was overwhelming that Lopez had in fact lied to the officer about his own gunshot wound. We add the jury was properly instructed that it is their responsibility to determine the credibility of witnesses. In these circumstances, we are satisfied the detective's statement that Lopez was deceptive on the night of the fatal shooting did not impermissibly intrude on the jury's province as trier-of-fact and was not clearly capable of producing an unjust result. See Rule 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.").

## IV.

Defendant contends for the first time on appeal the trial court erred in failing "to instruct the jury on oral statements allegedly made by a defendant as required by N.J.R.E. 104(c) and State v. Hampton and State v. Kociolek."[4]

---

[4] State v. Hampton, 61 N.J. 250 (1972); State v. Kociolek, 23 N.J. 400 (1957).

Those cases address the need for special cautionary instructions to the jury on how to evaluate a defendant's incriminating out-of-court statements. Specifically, defendant posits the jury should have been given Hampton/Kociolek instructions with respect to his girlfriend's testimony that he told her that he was "robbing in Cramer hill" on the day of the homicide, her testimony she "told police that defendant and [Lopez] went to rob inside a house and a guy was shot[;]" and the State's presentation of text messages between defendant and Lopez.[5]

None of the statements attributed to defendant were made in the course of a custodial interrogation. Accordingly, defendant's reliance on Hampton is misplaced. Our Supreme Court in that case held "there is no constitutional obligation to submit to the jury for determination the issue of whether the Miranda warnings were given to a defendant and the rights described thereby waived before he confessed." 61 N.J. at 267.

As we explained in State v. Baldwin, Hampton "require[s] the trial court to instruct the jury to decide whether a defendant's out-of-court statement is

---

[5] Although defendant's appellate brief refers to the text messages between him and Lopez as examples of Hampton/Kociolek violations, we remain unconvinced that written communications in the form of recorded text messages can invoke the concerns raised in Hampton or Kociolek.

credible only in a case where there has been a pretrial hearing involving the admissibility of the statement on the grounds of an alleged violation of the defendant's <u>Miranda</u> rights or involuntariness." 296 N.J. Super 391, 397 (App. Div. 1997). We thus held in <u>Baldwin</u> that when "an alleged oral inculpatory statement was not made in response to police questioning, and there is no genuine issue regarding its contents," the court is not required to give special cautionary instructions, "because the only question the jury must determine is whether the defendant actually made the alleged inculpatory statement." <u>Id.</u> at 401–02.

We turn our attention to whether the trial judge was obligated to give a special cautionary instruction pursuant to the rationale undergirding <u>Kociolek</u>. The oral statement attributed to Kociolek was not made during a custodial interrogation, and thus the rule established in that case is not limited to statements made while in police custody. The <u>Kociolek</u> Court, quoting Wigmore on Evidence, §§ 1056, 2094 (3d ed. 1940), acknowledged:

> there is a "general distrust of testimony reporting any extra-judicial [o]ral statements alleged to have been made, including a party's admissions"; the "great possibilities of error in trusting to recollection-testimony of oral utterances, supposed to have been heard, have never been ignored; but an antidote is constantly given by an instruction to the jury against trusting overmuch the accuracy of such testimony."

19

[23 N.J. at 421.]

Our Supreme Court thus recognized that an out-of-court inculpatory statement purportedly made by a defendant can be "dangerous" evidence, "first, because it may be misapprehended by the person who hears it; secondly, it may not be well-remembered; thirdly, it may not be correctly repeated." Id. at 429 (citations omitted).

Our decision in Baldwin addressed when a cautionary jury instruction should be given under the Kociolek doctrine and our analysis in that case is instructive for the present appeal. The State in Baldwin presented evidence in a murder trial supporting the identification of the defendant as the assailant, including testimony from three eyewitnesses and three inculpatory out-of-court statements purportedly made by the defendant. Baldwin, 296 N.J. Super. at 395. Baldwin argued that a trial court is obligated to provide cautionary instructions whenever evidence of a defendant's allegedly inculpatory out-of-court statement is proffered. Ibid. We rejected any such per se rule. We concluded "the need for the kind of special cautionary instruction suggested in Kociolek may turn on whether there is any genuine dispute as to the precise contents of an alleged oral statement." Id. at 400–01.

Here, as in Baldwin, the meaning of defendant's oral statements to his girlfriend does not turn on any nuances of language. We believe the phrase "robbing in Cramer Hill" was unambiguous and memorable. Thus, the circumstances in which defendant's statements to her were uttered do not present a substantial "risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer" as contemplated in Kociolek, 23 N.J. at 421.

Finally, we emphasized in Baldwin that there was no precedential authority for the proposition that the failure to give an unrequested Kociolek instruction constitutes plain error. Id. at 400. Defendant cites no case decided after Baldwin holding that the failure to sua sponte provide a Kociolek instruction rises to the level of plain error. We therefore conclude that even assuming for argument's sake that the failure to give the unrequested instruction was error—a proposition we seriously doubt—any such error was not capable of producing an unjust result in this case. See R. 2:10-2; see also State v. Montalvo, 229 N.J. 300, 320 (2017) ("Without an objection at the time a jury instruction is given, 'there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case.'") (quoting State v. Singleton, 211 N.J. 157 181–82 (2012)).

V.

Defendant contends for the first time on appeal the State did not provide sufficient reliable evidence to support his convictions beyond a reasonable doubt. We note defendant did not move before the Law Division judge for a new trial, and thus never provided the judge—who was intimately familiar with the trial proofs—an opportunity to address defendant's weight-of-the evidence claim. It is well-settled that courts will normally refuse to consider a "weight-of-the-evidence argument on appeal unless the appellant moved for a new trial on that ground." State v. Pierro, 438 N.J. Super. 517, 530 (App. Div. 2015). In order to prevail on such an appeal, the defendant bears the burden of proving plain error. State v. Weston, 222 N.J. 277, 295 (2015). Even putting aside this procedural defect, we believe defendant's argument on appeal is meritless, and warrants only brief discussion in this opinion. See R. 2:11-3(e)(2).

The well-established test for challenging the sufficiency of evidence for defendant's conviction(s) was articulated in State v. Reyes:

> the trial judge must determine whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonable could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

22

[50 N.J. 454, 458–59 (1967); <u>see also</u> <u>State v. Brown</u>, 80 N.J. 587, 591 (1979).]

The gravamen of defendant's argument is that the State's evidence of his guilt in the robbery and homicide is circumstantial. But as the holding in <u>Reyes</u> makes clear, circumstantial evidence may justify a guilty verdict as surely as direct evidence. Our own review of the record confirms the State adduced ample testimony and surveillance video evidence to support the guilty verdicts.

VI.

Defendant claims his sentence was manifestly excessive. Specifically, he argues the court erred in ordering the sentence imposed on the certain persons weapons conviction to be served consecutively to the sentences imposed on his other convictions. He also argues his fifty-eight-year aggregate sentence was disproportionate to the forty-five-year aggregate sentence imposed on Lopez. We reject these arguments and conclude that Judge Kelley imposed an appropriate sentence considering the applicable aggravating and mitigating

23

factors,[6] and considering the Yarbough[7] guidelines that are used to determine whether to impose concurrent or consecutive sentences.

The scope of our review of sentencing decisions is narrow. As a general matter, sentencing decisions are reviewed under a highly deferential standard. See State v. Roth, 95 N.J. 334, 364–65 (1984) (holding that an appellate court may not overturn a sentence unless "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience"). Our review is therefore limited to considering:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).]

---

[6] Judge Kelley found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) ("The risk that the defendant will commit another offense"); six, N.J.S.A. 2C:44-1(a)(6) ("The extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted"); and nine, N.J.S.A. 2C:44-1(a)(9) ("The need for deterring the defendant and others from violating the law"). Judge Kelley did not find any mitigating factors.

[7] State v. Yarbough, 100 N.J. 627 (1985).

"[A]ppellate courts are cautioned not to substitute their judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)). Similarly, a trial court's exercise of discretion that is in line with sentencing principles "should be immune from second-guessing." State v. Bieniek, 200 N.J. 601, 612 (2010).

We first address whether the sentencing judge erred in directing the sentence imposed on the certain persons conviction to be served consecutively to the sentence imposed on the felony-murder and other convictions. In Yarbough, the Supreme Court noted "there can be no free crimes in a system for which the punishment shall fit the crime." 100 N.J. at 643. The Court listed relevant considerations, including whether:

> (a) the crimes and their objectives were predominantly independent of each other;
> (b) the crimes involved separate acts of violence or threats of violence;
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
> (d) any of the crimes involved multiple victims;
> (e) the convictions for which the sentences are to be imposed are numerous.
>
> [Id. at 643–44.]

In State v. Cuff, the Court recognized "the Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." 239 N.J. 321, 348 (2019); see also State v. Molina, 168 N.J. 436, 442–43 (2001) (affirming consecutive sentences although "the only factor that support[ed] consecutive sentences [was] the presence of multiple victims"); State v. Carey, 168 N.J. 413, 427–28 (2001) (holding that "a sentencing court may impose consecutive sentences even though a majority of the Yarbough factors support concurrent sentences").

In this instance, Judge Kelley explicitly addressed the rationale undergirding Yarbough, concluding "I make [the certain persons offense] consecutive considering the Yarbough factors, and I do find that this is a separate offense with separate elements." We note that the evidence adduced at trial clearly shows the firearm was procured and possessed prior to the planned robbery and resultant homicide. As Judge Kelley noted at the sentencing hearing, it was defendant who brought the gun to commit the robbery that resulted in a homicide. Relatedly, the prior felony conviction that made

26

defendant a certain person was, of course, committed well before the criminal episode that took Franco's life.[8]

The sentence imposed on the felony-murder conviction advances the sentencing goal of general deterrence. The certain persons offense, in contrast, advances the sentencing goal of specific deterrence, putting persons convicted of designated crimes on clear notice that they are henceforth strictly prohibited from possessing a firearm. We are satisfied, as was the sentencing judge, that defendant's certain persons firearms conviction warrants separate punishment from the sentence imposed on the violent crime that was committed with the firearm. Cf. State v. Lopez, 417 N.J. Super. 34, 37 n.2 (App. Div. 2010) (noting that imposing sentences for certain persons offenses consecutively to other crimes is permissible, but not mandatory). That conclusion comports with the major tenet in Yarbough that there can be no "free crimes." 100 N.J. at 643.

We add that in Cuff, the Court noted that a sentencing court's focus "should be on the fairness of the overall sentence." 239 N.J. at 352 (citing State v. Miller, 108 N.J. 112, 121 (1987)). We believe the overall sentence imposed

---

[8] The record indicates that defendant was previously convicted of aggravated sexual assault in 2004, for which he was sentenced to ten years in prison subject to a mandatory minimum period of 8.5 years without parole under NERA.

in this case, including the consecutive sentence for the certain persons conviction, is fair and appropriate.

Finally, with respect to defendant's excessive sentence argument, we reject defendant's contention that the sentence he received is disproportionate to the aggregate forty-five NERA sentence imposed on co-defendant Lopez, who was tried separately. Judge Kelley carefully addressed why he imposed a longer aggregate term than the sentence he imposed on Lopez, explaining:

> I would indicate for the record that . . . the sentence is slightly higher than the sentence I imposed on [Lopez]. There's reasons for that. Primarily the reason is because this defendant was the older of the two, the more experienced person of the two, the one who had a prior record of the two. It appears to me, and as I said, the reasonable inference that can be drawn is that he is the one who had a gun, who brought the gun to unfortunately a tragic meeting with Mr. Franco that caused his death. While it's certainly obvious that [Lopez] suffered a wound when the gun was apparently being placed in his pocket, I don't know and the jury doesn't know, and no one knows other than [defendant] and [Lopez] probably, who actually pulled the trigger. But serious – but there's no doubt that his involvement in this felony murder caused the death of [Franco]. I believe the 50-year term is appropriate in this instance and that is why I'm imposing . . . a slightly higher term than I imposed upon [Lopez].

28

We agree with Judge Kelley's reasoning and conclude he did not abuse his discretion in distinguishing between defendant and Lopez for sentencing purposes, especially considering defendant's serious criminal history.[9]

VII.

Defendant contends the trial court committed cumulative errors warranting a new trial. In State v. Reddish, our Supreme Court acknowledged that "although an error or series of errors might not individually amount to plain error, in combination they can cast sufficient doubt upon the verdict to warrant reversal." 181 N.J. 553, 615 (2004). In State v. Weaver, the Supreme Court granted Weaver a new trial after concluding that it was "a classic case of several errors, none of which may have independently required a reversal and new trial, but which in combination dictate a new trial." 219 N.J. 131, 162 (2014); see also State v. Jenewicz, 193 N.J. 440, 473–74 (2008) (recognizing that even when individual errors do not amount to reversible error, when considered in combination, their cumulative effect can require reversal).

In this instance, however, we have rejected defendant's contentions with respect to each asserted error. To the extent we may have assumed for purposes

---

[9] As noted earlier, defendant was previously convicted of first-degree aggravated sexual assault and received a ten-year NERA sentence.

of argument that an alleged error was committed but did not rise to the level of plain error, we are satisfied defendant received a fair trial and that none of defendant's contentions, viewed individually or collectively, cast doubt upon the verdict as to warrant reversal.

We next address the contentions defendant raises in his pro se supplemental brief. Defendant for the first time on appeal challenges the admissibility of the text messages between him and Lopez.[10] Those hearsay statements were properly admitted as statements by a party-opponent under N.J.R.E. 803(b)(1) and statements made by a co-conspirator in the course of planning the robbery under N.J.R.E. 803(b)(5). We note that co-defendant Lopez in his separate trial objected to the admission of the text message and we affirmed their admissibility. State v. Lopez, No. A-1210-19 (App. Div. Sept. 23, 2020) (slip op. at 6). Defendant's remaining contention that there was no

---

[10] As we have noted, defendant filed a pre-trial motion to suppress the text messages on the grounds they were the fruit of the allegedly unlawful warrantless seizure of Lopez's cell phone. See supra section II. Defendant at trial did not object to the admissibility of the out-of-court statements under the Rules of Evidence.

basis to charge him with first-degree murder does not merit discussion in a written opinion.[11]  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[11]  We presume defendant is referring to the count in the indictment charging first-degree knowing/purposeful murder, not the count charging first-degree felony murder.  Both offenses are designated as first-degree crimes and carry the same mandatory minimum sentence.

A-0315-18